[No. D057091. Fourth Dist., Div. One. Apr. 28, 2011.]

MARK T., Plaintiff and Respondent, v.
JAMIE Z., Defendant and Appellant.

**COUNSEL**

Jamie Z., in pro. per., for Defendant and Appellant.

Hargreaves & Taylor, J. William Hargreaves and Elizabeth A. Kreitzer for Plaintiff and Respondent.

**OPINION**

**AARON, J.—**

## I.

## INTRODUCTION

Jamie Z. appeals from a final order of the trial court establishing a legal and physical custody sharing arrangement pertaining to L., the minor child of Jamie and Mark T. At some point after L. was born, Mark filed a petition to establish his paternity, and the parties agreed to a temporary joint custody arrangement pursuant to which Jamie had primary physical custody of L. The court entered an order establishing Mark's paternity, and entered a temporary custody order based on the time-sharing agreement that the parties had reached. Before the court entered a permanent custody order, Jamie filed an order to show cause (OSC) requesting that the court permit her to relocate L.'s residence to Minnesota, where Jamie and L. would have the financial and emotional support of Jamie's family.[1]

In fashioning its permanent custody order, the trial court adopted the recommendations of an evaluating psychologist who the parties had agreed would conduct psychological evaluations of both parties. The court denied Jamie's request to relocate L.'s residence to Minnesota and retained the physical custody arrangement to which the parties had previously agreed, under which Jamie had primary physical custody of L. In making this order, the court apparently assumed—as did the evaluator—that Jamie would not move to Minnesota if the court denied her request to relocate L.'s residence.

We conclude that the trial court abused its discretion by misapplying the pertinent legal standards in the context of a move-away request. When a

---

[1] We will refer to Jamie's request as a "move-away request," as courts have generally referred to this type of motion. (See, e.g., *In re Marriage of Lucio* (2008) 161 Cal.App.4th 1068, 1079 [74 Cal.Rptr.3d 803].) To be clear, the term "move-away request" refers to a parent's request to move the residence of the child and/or children, *not* a request by the parent to move his or her own residence.

parent who shares joint physical custody of a minor requests authorization to relocate the minor, the court must proceed on the assumption that the parent will in fact be moving, and must fashion a custody order that is in the best interests of the minor accordingly. Here, the court failed to determine what custody arrangement would be in L.'s best interests, assuming that Jamie did relocate to Minnesota. We therefore reverse the order of the trial court and remand the matter for the court to apply the legal standard that is required when, as here, a parent who shares joint physical custody of a child under a temporary custody arrangement makes a request to relocate the child's residence.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

Mark and Jamie are the parents of L., who was born in December 2007. At the time the court made its custody determination, L. was 22 months old. Jamie has been L.'s primary caregiver since his birth.

Mark and Jamie were in a dating relationship when Jamie became pregnant with L. They moved in together and lived together during the pregnancy. Jamie was fired from her job during the seventh month of her pregnancy. After L. was born, the parties' relationship became strained. In May 2008, Mark moved out of the shared residence.

In July 2008, Mark filed a petition to establish a parental relationship. Mark sought joint legal and physical custody of L. The parties met with Family Court Services (FCS), but were unable to reach an agreement regarding custody issues. Mark also filed a companion OSC seeking to address child support and attorney fee issues.

FCS filed a report with the court in September. The trial court adopted the recommendations in the FCS report concerning custody and visitation, with the exception of an item regarding when Mark would begin to have overnight visits with L. The court continued additional issues that Mark raised in his OSC to November 10, 2008.

On November 10, the court adopted the FCS recommendation regarding Mark's overnight visits with L. The court ordered that once L. reached one year of age, Mark would have physical custody of L. every weekend from Saturday at 10:00 a.m. through Sunday at 6:00 p.m. The court also made findings with respect to child support and unreimbursed expenses related to L.'s care, but continued the issues of attorney fees, rent credits and child support arrears to early February 2009.

In December 2008, Mark filed another OSC in which he requested modification of the child support order because he had been laid off from his job. Ten days later, Jamie filed an OSC in which she requested authorization to relocate L.'s residence to Minnesota. Jamie testified prior to the hearing on her move-away request that she decided to seek authorization to change L.'s residence because she was unemployed and was having extreme difficulty finding a job in San Diego. She had been searching for a job in earnest since mid-October 2008.[2] Jamie had received some emergency aid from the State of California for a period of time before the court set child support, and she had borrowed approximately $15,000 to $20,000 from her mother and stepfather. Jamie planned to move to Minnesota and live with her mother and stepfather. Her parents and her sister would provide assistance with childcare. In addition, the cost of living is significantly less in Minnesota than in California. Jamie planned to return to school part time, and had already been offered an unpaid internship doing design work at a company in Minnesota.

Mark filed a third OSC on January 20, 2009, seeking physical and legal custody of L.

As of February 2, 2009, the parties stipulated that they would each submit to a psychological evaluation to be conducted by Dr. Lori Love. On February 4, the trial court entered a judgment establishing Mark's paternity, after the parties stipulated to that issue. The court reserved jurisdiction over questions of custody and child support.

In late February and early March, both parties filed additional OSC's regarding modification of child support, attorney fees, costs, and visitation.

In April, the parties entered into a stipulation concerning the issues that had been left unaddressed as of the November 10, 2008 hearing. For example, the parties agreed that L.'s primary residence would be with Jamie, and that Mark would have custody of L. every Monday and Wednesday from 6:00 p.m. to 8:30 p.m., and every Friday from 6:00 p.m. until Sunday at 6:00 p.m. The court adopted the terms of the parties' agreement, and memorialized the terms in a document that the court filed on June 16, 2009, entitled "Findings and Order After Hearing."[3]

---

[2] At the time of the hearing, Jamie had still been unable to find employment of any kind.

[3] The only reference in the record to the "hearing" to which this document refers is a statement in the court's June 16, 2009 Findings and Order After Hearing that the matter was heard on April 14, 2009.

Dr. Love completed her psychological report and recommendations on May 1, 2009.[4] In the report, Dr. Love states that she "was appointed . . . for the purpose of conducting a psychological evaluation and preparing a report, with recommendations, regarding custody of the minor child, [L.], in light of the request by mother to move with [L.] to the state of Minnesota."

After providing a lengthy summary of various testing and analysis pertaining to L., as well as to Jamie and Mark and other family members, Dr. Love stated, "[L.] is an alert and engaging child. He displays an excellent temperament which bodes well for joint custody. . . . It is clear that each parent loves [L.] and is trying to do the best they can." Dr. Love commented, "This examiner understands the importance of having extended family around for support however this cannot be justified as being in [L.'s] best interest[s] when it means removing him from a loving and capable father. Jamie stated that she did not have an active father in her life and very much wants that to happen for [L.] It would be virtually impossible for Mark to be an active father from across the country."

According to Dr. Love, "Jamie has been a good primary caretaker of [L.] and she should remain so until he is no longer in the 'tender years.' In the mean time, Mark should gradually increase his time with [L.] so that when [L.] reaches 5 years of age he can enjoy equal time with his parents."

Dr. Love recommended that both parents "share joint legal custody of [L.]" She also stated, "It is not recommended that [L.] be permitted to move out of the [C]ounty of San Diego." Dr. Love did not recommend a change in primary custody, however. Instead, she recommended "that father enjoy an increase in time with [L.] on a level commensurate with [L.'s] age."

Dr. Love's proposed custody arrangement assumed that Jamie would remain as L.'s primary caretaker, with Mark having approximately a 30 percent time-share, at least until L. reaches the age of five. Dr. Love recommended that when L. attained the age of five, the parties should undertake a "2-2-5" schedule, which would give them equal physical custody of L. and would require that L. be transferred between the parties multiple times each week.

In late October and early November 2009, the trial court held a three-day trial to address Jamie's move-away request and the issue of attorney fees and costs. The court heard testimony from seven witnesses, including Mark, Jamie, Dr. Love, and FCS mediator Lynn Waldman, who had written a report on the matter in April 2009.

---

[4] Dr. Love filed an addendum to her report on May 22 in response to questions from Jamie's attorney.

FCS mediator Waldman testified that her recommendation was that Jamie's move-away request be granted, noting that Jamie had been L.'s primary caretaker since his birth, that Jamie had been unable to find a job in San Diego and was "living in poverty," and that Jamie appeared "to have a clear plan for the move." Dr. Love testified in a manner consistent with her report. Dr. Love stated that she did not believe that Jamie had "bad faith" motives for requesting the move-away order.

The trial court issued a tentative statement of decision in which the court indicated that it would adopt Dr. Love's recommendations, and that it intended to deny Jamie's move-away request. The court set Mark's time-share with L. at 33 percent, and Jamie's time-share at 67 percent. The court also addressed attorney fees and costs, granting Jamie $5,000 in fees and costs due to the disparity in the parties' incomes and assets.

In its final statement of decision, the court essentially adopted its tentative statement of decision, with a few minor modifications. The court stated, among other things, "There is no certainty of outcome if the move away is granted. [L.] may or may not be able to maintain his bond with [Mark]." According to the trial court: "[L.] needs this stability with both parents. The distance of the move is of great concern. [Mark] has just obtained new employment and is beginning a career here in California. He will have limited time to travel to and from Minnesota in the next two years while he establishes his career. A career that is necessary to provide financial support for [L.] [Jamie] has the potential of part-time employment and the hope to return to school. There is no guarantee. She is not in the position to provide any consistent financial support at this time or in the near future. Dr. Love's perception is well-taken; [L.] is too young for this move. Both of the parents have a strong bond with [L.] [Jamie's] reluctance to focus on [L.'s] long term need to have a bond with his father is undermining her ability to have reasoned and calm communication with [Mark]. A factor that will not improve with distance."

The court went on to state: "The reasons for the move away are suspect. To start with, [Jamie's] inability to get a job. The Court has difficulty in understanding how [Jamie] has sent out 1,000 applications but has not received one interview. It is clear that she needs to change her approach. She needs to accept [Mark's] offer to babysit and go door to door and apply rather than relying solely on the internet. She would be well advised to not share the circumstances of her previous termination with potential employers. The support of her family is commendable, but it should not serve as a substitute for the bond that is being fostered between [L.] and his father. [Jamie's] family should be encouraged to make the trips that have been argued as [Mark's] responsibility. This move may be what [Jamie] wants but it is not best for [L.]"

The trial court concluded, "Therefore, it is this Court's belief that such a move will have a long term detrimental impact on [L.'s] ability to maintain his relationship with his father. Therefore, the move away is [hereby] denied."

The court later filed a document entitled "Findings and Order After Hearing." In this document, the court made a number of orders, including the following: "Respondent's request to move the minor child . . . outside of the County of San Diego, California and to the State of Minnesota is denied." The court also ordered that as of January 1, 2010, the following custody arrangement would be in place: Mark is to have custody of L. on Monday evenings, from 6:00 p.m. until 8:30 p.m.; on Wednesdays from 6:00 p.m. until the following morning at 8:00 a.m., and, on alternating Fridays from 6:00 p.m. until 8:30 p.m., or from 6:00 p.m. until the following day at 6:00 p.m.; Jamie is to have physical custody of L. at all other times. The court also made a variety of other orders relating to vacations, holidays, child support and attorney fees.

Jamie filed a timely notice of appeal.

## III.

## DISCUSSION

Where, as here, a parent who shares joint custody of a minor makes a request to relocate the child in the context of an initial custody determination, the trial court must decide de novo what physical custody arrangement would be in the child's best interests. In making its custody determination, *the court must proceed on the assumption that the parent who is making the request will relocate his or her own residence*, regardless of whether the court grants or denies the request. In this case, the court erroneously failed to conduct its best interests analysis based on the presumption that Jamie would be relocating to Minnesota.

### A.   *Standard of review*

In general, "[t]he standard of appellate review of custody and visitation orders is the deferential abuse of discretion test." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [51 Cal.Rptr.2d 444, 913 P.2d 473] (*Burgess*).) A trial court abuses its discretion if there is no reasonable basis on which the court could conclude that its decision advanced the best interests of the child. (*In re Marriage of Melville* (2004) 122 Cal.App.4th 601, 611 [18 Cal.Rptr.3d 685]; *Burgess, supra,* at p. 32.) A discretionary order that is based on the application of improper criteria or incorrect legal assumptions is not an

exercise of informed discretion, and is subject to reversal even though there may be substantial evidence to support that order. (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 436 [97 Cal.Rptr.2d 179, 2 P.3d 27]; *Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 655 [22 Cal.Rptr.2d 419].)

## B. *Legal standards*

■ This matter was in the trial court for the determination of an initial permanent custody order. Although the trial court had previously entered an interim custody order, there was no *final* judicial custody determination in place at the time of the hearing. "In an initial custody determination, the trial court has 'the widest discretion to choose a parenting plan that is in the best interest[s] of the child.' [Citation.] It must look to all the circumstances bearing on the best interest[s] of the minor child. [Citation.] Family Code section 3011 lists specific factors, 'among others,' that the trial court must consider in determining the 'best interest[s]' of the child in a proceeding to determine custody and visitation: '(a) The health, safety, and welfare of the child. [¶] (b) Any history of abuse by one parent against the child or against the other parent. . . . [¶] (c) The nature and amount of contact with both parents.' " (*Burgess, supra*, 13 Cal.4th at pp. 31–32, italics omitted.)

"In an initial custody determination, a parent seeking to relocate with the minor children bears no burden of establishing that the move is 'necessary.' The trial court must . . . consider, among other factors, the effects of relocation on the 'best interest[s]' of the minor children, including the health, safety, and welfare of the children and the nature and amount of contact with both parents. [Citation.]" (*Burgess, supra*, 13 Cal.4th at p. 34.) In general, the trial court shall consider "the effects of relocation on the 'best interest[s]' of the minor children." (*Ibid.*)

■ In *Niko v. Foreman* (2006) 144 Cal.App.4th 344 [50 Cal.Rptr.3d 398] (*Niko*), the court addressed a move-away request made by a parent who shared joint physical custody pursuant to a permanent custody order. Because the parents in *Niko* shared joint physical custody, the court determined that the proper inquiry was what custody arrangement would be in the best interests of the child.[5] The *Niko* court explained, "When the parents have

---

[5] Although *Niko* involves a move-away request made after the court had already entered a permanent custody order, unlike the situation here where the trial court was making an initial permanent custody order, *Niko* applies the same standard that applies in this case—i.e., what is in the best interests of the child, and *not* the "changed circumstance" standard, a variation of the "best interests" test that typically applies to requests to modify a custody arrangement after a permanent order is in place. Because *Niko* applies the same standard as is applicable here, and also involves a move-away request in a situation in which the parents had been sharing actual joint physical custody (as the parents in this case have been doing pursuant to their agreement and the temporary order of the court), we cite *Niko* as authority in this case.

joint physical custody, modification of the coparenting arrangements is not a change of custody requiring change of circumstances. Instead, the trial court has wide discretion to choose a parenting plan that is in the best interest[s] of the child. [Citation.] The joint custody moving parent does not have the presumptive right to change the child's residence, and bears no burden of proving the move is essential or imperative. [Citation.] Nor does the opposing nonmoving parent bear the burden of showing substantial changed circumstances require a change in custody or that the move will be detrimental to the child." (*Id.* at pp. 363–364.)

The *Niko* court commented that "[t]he value in preserving an established custodial arrangement and maintaining stability in a child's life is obvious." (*Niko, supra,* 144 Cal.App.4th at p. 364.) However, the court further noted that "when the status quo is no longer viable.. . . , a court must review de novo the best interest[s] of the child. It can fashion a new time-share arrangement for the parents." (*Ibid.*) In other words, the de novo review that applies in a joint parenting situation is, "in effect, a 'reexamination' of the basic custody arrangement" because one parent's relocation in a joint physical custody arrangement will necessarily disrupt the status quo, and will require the court to modify the existing custody arrangement. (*In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 142 [61 Cal.Rptr.2d 559].)

■ "[W]hen the trial court is faced with a request to modify the existing custody arrangement on account of a parent's plan to move away (unless the trial court finds the decision to relocate is in bad faith), the trial court must treat the plan as a serious one *and must decide the custody issues based upon that premise.* The question for the trial court is not whether the parent may be *permitted* to move; the question is what arrangement for custody should be made [if and when the parent moves]. [Citation.]" (*Ruisi v. Thieriot* (1997) 53 Cal.App.4th 1197, 1205–1206 [62 Cal.Rptr.2d 766], fn. omitted, italics added (*Ruisi*); see also *Brody v. Kroll* (1996) 45 Cal.App.4th 1732, 1736 [53 Cal.Rptr.2d 280].)[6]

Applying these same authorities, another panel of this court recently held that the trial court applied the incorrect legal standard in a case very similar to the one before us. In *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, a father who had previously been granted sole physical custody under a nonfinal custody order sought to relocate his child's residence to Washington. The trial court

---

[6] "That an order modifying custody may be conditional upon the relocation of a parent does not render the decision an advisory opinion." (*Ruisi, supra,* 53 Cal.App.4th at p. 1206.) This is because "[i]t is neither practical nor in the best interest of the child to require a parent to move first, and seek permission and modification after the fact. Therefore, the law allows a court to conduct a hearing based on the *intention* to move and make a custody order conditioned on the move being effectuated. Such a conditional modification order is not considered 'an advisory opinion.' [Citation.]" (*Niko, supra,* 144 Cal.App.4th at p. 365.)

denied the move-away request, and assumed that the father would remain in San Diego if the court denied the request. The trial court stated, " 'Nobody has informed the [c]ourt that [Father] absolutely will move even if the request is denied, so the court will not examine that question at this time and will assume that he is staying [in San Diego]. Should [Father] return ex parte and inform the court that he will move regardless, the court will then determine whether a change in custody . . . is in [Child's] best interest[s].' " (*Id.* at p. 22.) The appellate court concluded that although the trial court had purported to apply the best interests test in deciding the father's move-away request, the trial court had "misunderstood the proper legal standards to be applied in determining whether Father's move-away motion should be granted" (*id.* at p. 21) because, among other things, the trial court failed to decide "the ultimate question whether a change in custody would be in Child's best interests were the custodial parent (Father) to move to Washington" (*id.* at p. 22).

■ From these authorities we ascertain that the following standard is to be applied when a trial court is considering a parent's request to relocate the child in the context of an initial custody determination: The court must decide de novo what physical custody arrangement would be in the child's best interests, *assuming that the requesting parent will relocate.*

## C. *Analysis*

Based on our review of the record, it appears that the trial court misapplied the pertinent legal standard in determining Jamie's move-away request. In this case, the trial court was to decide de novo what physical custody arrangement would be in L.'s best interests, but, again, presuming that Jamie would no longer be living in California.[7] Although the trial court ostensibly applied the correct legal standard—i.e., the "best interests" test[8]—the court failed to take as a given Jamie's relocation to Minnesota. Instead, the court determined L.'s best interests based on the assumption that the court could cause Jamie to remain in San Diego merely by denying her request to relocate L.'s residence. The court's approach to the determination of the custody issue thus reflects a misunderstanding of how a trial court is to apply the best interests test in the circumstances of an initial custody determination

---

[7] The broad "best interests" standard applies in this case both because the court was making an initial permanent custody order, and because, under the temporary custody arrangement, both parties had significant physical custody of L. (although Jamie provided the "primary residence" for L.), and thus shared de facto joint physical custody. However, it is also clear that Jamie had been L.'s primary caregiver under the temporary custody arrangement, and Dr. Love expressed the view that Jamie should remain L.'s primary caretaker "until he is no longer in the 'tender years.' "

[8] The court stated, "This is an initial custody evaluation in which the Court is seeking to determine what is in the best interest[s] of the child."

where a parent who shares joint physical custody intends to relocate and seeks to relocate the child's primary residence as well.

The trial court, in effect, avoided the ultimate question, i.e., what custody arrangement would be in L.'s best interests, *assuming Jamie's proposed move to Minnesota.* It appears that the trial court did not regard Jamie's plan "as a serious one," and failed to "decide the custody issues based upon that premise." (*Ruisi, supra,* 53 Cal.App.4th at p. 1206.) The court's order states: "[Jamie] did not testify she would leave [L.] here in San Diego and move back to Minnesota if the move away was denied." This comment reflects the error in the trial court's analysis; the court appears to have been under the misimpression that it could coerce Jamie into remaining in San Diego through its custody order.

In addition, the trial court abused its discretion in adopting Dr. Love's analysis and recommendations as set forth in Dr. Love's report, because Dr. Love failed to address *the* pertinent question with respect to Jamie's proposed relocation. Specifically, as Mark concedes, "Dr. Love's report did not contain a proposed parenting plan if [Jamie] moved to Minnesota." Further, as Mark acknowledges, "[t]he trial court adopted the recommendations of Dr. Love," even though Dr. Love failed to address what should happen if and when Jamie relocates out of state. The very issue that Dr. Love was supposed to address is what parenting plan would be in L.'s best interests, *given that Jamie intended to move to Minnesota.*

The question that was properly before the court, and that the court failed to address, is whether it would be in L.'s best interests to allow Jamie to change L.'s residence to Minnesota, thereby increasing Jamie's share of the physical custody of L., or rather, whether it would be in L.'s best interests to deny Jamie's request, thereby significantly altering the current physical custody arrangement by making Mark, rather than Jamie, L.'s primary custodial parent and caretaker. The court misapplied the law in adopting Dr. Love's recommendations, because in making those recommendations, Dr. Love incorrectly assumed that preserving the status quo parenting arrangement was an option, even in the face of Jamie's expressed intent to move to Minnesota. (See, e.g., *In re Marriage of Whealon, supra,* 53 Cal.App.4th at p. 142 [in a move-away case where parents share joint physical custody, the status quo custody arrangement will necessarily be disrupted].)

To the extent that the trial court denied the move-away request with the goal of maintaining the status quo and/or coercing Jamie to abandon her proposed plan to move to Minnesota, it abused its discretion. "[A] court must not issue such a conditional order [(e.g., changing custody to the noncustodial

parent)] for the purpose of coercing the custodial parent into abandoning plans to relocate. Nor should a court issue such an order expecting that the order will not take effect because the custodial parent will choose not to relocate rather than lose primary physical custody of the children." (*In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1098 [12 Cal.Rptr.3d 356, 88 P.3d 81].)

At the hearing on Jamie's OSC, Mark's attorney asked Jamie whether she would move to Minnesota if the court were to deny her request to relocate L.'s residence. Jamie responded, "I don't know how to answer that. No. I mean—no, I can't imagine leaving him, of course, but at the same time I guess I have to think about what's best for him, so I don't know how to—I can't. No, I don't, at this point—I can't, no, but I don't know what to do." From Jamie's response, it is clear that she did not want to move to Minnesota if the court would not allow her to relocate L.'s residence so that she could take L. with her. However, this line of inquiry was improper, since the court should not have considered whether or how Jamie might alter her plan to relocate, depending upon how the court ruled. As stated earlier, the court was required to presume that Jamie would, in fact, be moving, and should have made its custody determination based on that premise. Jamie should not have had to respond to this question, and the court should not have considered her response, as it did when it expressly noted in its statement of decision that Jamie had effectively conceded that she would not move to Minnesota if her move-away request was denied.[9]

By failing to assume that Jamie in fact intended to move to Minnesota in making its custody determination, the trial court avoided addressing the very question raised by Jamie's move-away request—i.e., what arrangement for custody would be in L.'s best interests, assuming Jamie's move to Minnesota. Instead, the court entered a coparenting order that cannot be effectuated if and when Jamie moves to Minnesota.[10]

■ We acknowledge that the trial court referred to Jamie's reasons for relocating as "suspect," thereby raising the possibility of a finding of bad faith on Jamie's part in requesting the move-away order. Although the court did not expressly find that Jamie's plans were designed "simply to frustrate" Mark's contact with L. or were made in bad faith (*Burgess, supra,* 13 Cal.4th at p. 36, fn. 6), one could interpret the court's statement as suggesting an improper motive on Jamie's part. The trial court may consider whether a

---

[9] The court stated, "[Jamie] did not testify she would leave [L.] here in San Diego and move back to Minnesota if the move-away was denied."

[10] It would be impracticable for Mark to have custody of L. on Monday nights, Wednesdays overnight, and every other weekend, and for Jamie to have custody of him at all other times, if Jamie is living in Minnesota and Mark remains in California.

parent is motivated to relocate the child's residence in an attempt to limit the child's contact with the other parent. (*Ibid.* ["[A] custodial parent's decision to relocate simply to frustrate the noncustodial parent's contact with the minor children" may be a basis for changing custody, since "[e]ven if the custodial parent is otherwise 'fit,' such bad faith conduct may be relevant to a determination of what permanent custody arrangement is in the minor children's best interest[s]. [Citations.]"]; see also *Niko, supra,* 144 Cal.App.4th at p. 364 ["When parents share joint custody the trial court need not question the wisdom of a parent's move or examine the reasons for the proposed move, but should certainly consider evidence of bad faith by the moving party if such exists. [Citations.]"].)

It does not appear, however, that the court made a finding that Jamie filed her move-away request in order to limit Mark's contact with L., and the court's statement that the reasons for Jamie's proposed move were "suspect" does not provide a basis for upholding the trial court's decision.[11] The court's comments regarding Jamie's reasons for moving to Minnesota appear to constitute second-guessing as to the wisdom of Jamie's decision to move (i.e., questioning the "necessity" of the relocation), as opposed to a finding that her decision to move was made "simply to frustrate the noncustodial parent's contact with the minor child[]." (*Burgess, supra,* 13 Cal.4th at p. 36, fn. 6.) The court questioned Jamie's inability "to get a job" in San Diego. The court also stated that although "[t]he support of [Jamie's] family is commendable . . . it should not serve as a substitute for the bond that is being fostered between [L.] and his father," and that Jamie's family "should be encouraged to make the trips that have been argued as [Mark's] responsibility." The court concluded its comments by stating, "This move may be what [Jamie] wants but it is not best for [L.]"

The *Burgess* court made it clear that a parent who has the right to custody of a child is not required to establish the necessity of a proposed move. (*Burgess, supra,* 13 Cal.4th at p. 36.) "[F]undamentally, the 'necessity' of relocating frequently has little, if any, substantive bearing on the suitability of a parent to retain the role of a custodial parent. A parent who has been the primary caretaker for minor children is ordinarily no less capable of maintaining the responsibilities and obligations of parenting simply by virtue of a reasonable decision to change his or her geographical location." (*Ibid.*)[12]

---

[11] Dr. Love did not find evidence of "bad faith" on Jamie's part. When asked whether there were any facts that would demonstrate that the move-away request was being made in bad faith, Dr. Love stated that she "did not find any clear evidence of 'bad faith' on the part of either party."

[12] The *Burgess* court noted that a parent may have any number of reasons for seeking to relocate, and made it clear it would be unreasonable to assume that one or both unmarried parents of a child will remain in the same location permanently: "[O]urs is an increasingly

██ Further, even a finding of bad faith would not permit the court to leave the current custody arrangement in place. A determination that a parent's proposed move is motivated, in whole or in part, by a desire to frustrate the other parent's contact with the child is a factor that the trial court may consider in determining what custody arrangement would be in the child's best interests, but it does not permit the court to ignore the primary assumption that the court must make in the context of a move-away request—i.e., that the requesting parent will, in fact, relocate his or her own residence, regardless of the outcome of the move-away request. As the *Burgess* court explained, "An obvious exception [to the general premise that a parent who has been the primary caretaker for minor children is no less capable of maintaining the responsibilities of parents by virtue of a reasonable decision to change location] is a custodial parent's decision to relocate simply to frustrate the noncustodial parent's contact with the minor children. 'Conduct by a custodial parent designed to frustrate visitation and communication *may be grounds for changing custody.*' [Citations.] Even if the custodial parent is otherwise 'fit,' such bad faith conduct may be relevant to a determination of what permanent custody arrangement is in the minor children's best interest[s]. [Citations.]" (*Burgess, supra,* 13 Cal.4th at p. 36, fn. 6, italics added.)

Thus, even where the court finds that a move-away request is being made in bad faith, the court must view this finding as only one potential factor in deciding whether to allow the child's residence to be moved; it does not permit the court to deny the move-away request on the presumption that in denying the request, the court can assure that the requesting parent will not in fact move, and that the court can thereby maintain the status quo parenting arrangement. That one parent may have been motivated, in part, to relocate the child's residence by a desire to lessen the child's contact with the other parent does not mean that the court should apply any standard other than what would be in the best interests of the child.

██ Because it is clear from the record that the trial court misunderstood that it was required to assume that Jamie would be relocating when it

mobile society. Amici curiae point out that approximately one American in five changes residences each year. [Citation.] Economic necessity and remarriage account for the bulk of relocations. [Citation.] Because of the ordinary needs for both parents after a marital dissolution to secure or retain employment, pursue educational or career opportunities, or reside in the same location as a new spouse or other family or friends, it is unrealistic to assume that divorced parents will permanently remain in the same location after dissolution or to exert pressure on them to do so. It would also undermine the interest in minimizing costly litigation over custody and require the trial courts to 'micromanage' family decisionmaking by second-guessing reasons for everyday decisions about career and family." (*Burgess, supra,* 13 Cal.4th at pp. 35–36, italics omitted.)

fashioned its initial permanent custody order, and thereby abused its discretion in failing to apply the proper legal standard to the issue at hand, we remand the matter to the trial court for reconsideration of custody and visitation, given Jamie's proposed move to Minnesota.

## IV.

## DISPOSITION

The trial court's order is reversed. The matter is remanded to the trial court for a new determination of custody and visitation based on Jamie's proposed move to Minnesota.

McConnell, P. J., and Irion, J., concurred.

Respondent's petition for review by the Supreme Court was denied July 20, 2011, S193807.