Filed 9/7/16  Smith v. Villafana CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| EARL SMITH,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>REBEKAH VILLAFAÑA,<br><br>    Defendant and Appellant. | B264476<br><br>(Los Angeles County<br>Super. Ct. No. PF 004106) |

        APPEAL from order of the Superior Court of Los Angeles County, Dianna Gould-Saltman, Judge.  Affirmed.

        Rebekah Villafaña, in pro. per., for Defendant and Appellant.

        Earl Smith, in pro. per., for Plaintiff and Respondent.

_____

## INTRODUCTION

The parties are before us for a second time. In the prior case, we affirmed an order awarding Earl Smith (Father) sole legal and physical custody of their minor daughter (the child), and granting Rebekah Villafaña (Mother) monitored visitation rights every Friday and Sunday mornings. (See *E.S. v. R.V.* (May 16, 2011, B223635) [unpub. opn.].) Subsequently, Mother filed a request to modify the order. Arguing that Father had frustrated her visitation rights, Mother sought a full reversal of the order. Following an evidentiary hearing, the trial court issued an order maintaining Father's status as the sole legal and primary physical custodian, but modifying the visitation procedures to address Mother's concerns. Mother contends the trial court erred in continuing monitored visits. Finding no abuse of discretion, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On February 16, 2010, the trial court (Commissioner Patricia M. Ito) issued an order awarding Father sole legal and physical custody of the child. Mother was granted visitation rights every Friday and Sunday, from 9:00 a.m. until 1:00 p.m. Each of Mother's visits was required to be monitored by "a professional monitor or a responsible adult agreed upon by the parties." The visits were to be held at "a facility such as was previously used in the past, the cost of which is to be borne by [Mother]." On May 26, 2011, following Mother's appeal, we affirmed the order.

On April 17, 2014, Mother filed a request for an order modifying the February 16, 2010 order. She sought sole legal and physical custody of the child, and an order granting Father monitored visits every Sunday and every Father's Day, from 9:00 a.m. to 1:00 p.m., as well as Thanksgiving Day and Christmas Day, from 9:00 a.m. to 1:00 p.m., in alternating years. In support of her request, Mother submitted a declaration stating that Father had refused to provide her with recent

pictures of the child or update her regarding the child's health and education. She argued that Father had failed to provide the child with a stable and consistent life, noting that he had gone from being employed -- when the case began -- to unemployed as a result of a disability, to being a freelance music teacher. In contrast, Mother noted that she had lived in the same residence for the past six years, had paid 100 percent of the child's medical insurance for the past five years, and had maintained her employment with the Los Angeles Unified School District since 2006.

Mother also detailed how Father allegedly had frustrated her visitation rights. According to Mother, beginning in 2011, as a result of changes in her work schedule, she asked Father to change her Friday visit to another day in the week, but Father refused. Father also rejected and terminated the services of a professional monitor Mother had employed (Tania Spivak), although the February 16, 2010 order did not authorize him to do so. He arbitrarily deemed certain locations inconvenient and refused to conduct the custodial exchange at those locations. Finally, Father refused to allow Mother's parents to be present during the visits.

A.    *Evidentiary Hearing on Mother's Petition to Modify Order*

The trial court (Judge Dianna Gould-Saltman) held a hearing on Mother's request for modification of the February 16, 2010 custody and visitation order. Over several days, the court heard testimony and oral argument. Minor's counsel advised the court that Commissioner Ito originally implemented monitoring due to (1) "grave concerns" about Mother's mental health based on her suicidal text messages to Father, and (2) Mother's unwillingness to "co-parent with the Father" -- as indicated, inter alia, by statements in court that she wished the child was in foster care rather than with Father.

3

Mother testified she was seeking sole legal and physical custody because Father had interfered with her custodial visits over the past five years. In response to Mother's argument that Father did not provide stability for the minor child because he was unemployed, the court observed that unemployment "has nothing to do with stability."

Spivak testified that she had provided monitoring services for Mother from March to April 2013 and from August to November 2013. She stated that Father restricted the locations of the visits and had denied Mother court-ordered visits on at least two occasions. On cross-examination, Spivak admitted that Father terminated her monitoring services because he was disappointed that on two occasions, she was not within close proximity to Mother and the child.

Father opposed Mother's request for sole legal and physical custody. He denied engaging in a "campaign" to withhold visitation between Mother and the child. He asserted that he had tried to accommodate Mother's requests. For example, in response to Mother's request to change her court-ordered visits from Friday to Saturday, Father told Mother that it would be more appropriate to change that weekday visit to another weekday, such as Wednesday. Father also recalled being late for court-ordered visits only three times over the past five or six years.

Father testified about a specific court-ordered visit. Mother had changed the visit site from a nearby location to a location 40 minutes away. Father objected to the new location because it would preclude him from arriving promptly at the location to resolve any issues involving the child. After Father objected, Mother cancelled the visit. Subsequently, during the scheduling of other visits, Father proposed alternate sites located nearby, but Mother refused. Father also asserted that he had no objection to Mother's parents being present at the visits, only to them being monitors. He explained that Commissioner Ito had stated that

4

Mother's parents were not appropriate monitors, and had precluded them from acting as monitors.[1]

The court also heard about an incident arising from a recent court-ordered Sunday visit. For the November 2, 2014 visit, Spivak scheduled the pickup of the child at Father's house. After Father told Spivak that the pickup location was inappropriate, Spivak cancelled the visit. Following the cancellation, Mother and the maternal grandmother went to the Van Nuys police station, where Mother provided the police with a copy of the February 16, 2010 order showing any responsible adult could act as a monitor. She did not mention Commissioner Ito's oral order precluding the maternal grandmother from acting as a monitor. The police advised Mother and the maternal grandmother to go to Father's house and knock on his door. They did so. After getting another occupant to let them past the locked gate, Mother and the maternal grandmother started pounding on Father's door and yelling for the child to be brought out. As time went by, they became increasing agitated and loud. Father had the child sit in the bathroom with the radio on so she could not hear the yelling. After 30 minutes, Mother and the maternal grandmother left.[2]

---

[1] Minor's counsel confirmed that Commissioner Ito had barred Mother's parents from serving as monitors. The maternal grandmother admitted being present at a 2010 hearing where "the judge said [she] could not be the monitor."

[2] At a hearing on Father's request for a restraining order arising from this incident, the court (Judge Gould-Saltman) noted that an existing order required Mother to have a monitor during visits with the child, and that the maternal grandmother could not act as a monitor. It found that Mother intentionally "made an attempt to circumvent [the existing order] by providing only partial information to the police, and then relied on the police based on the partial information you gave them." The court ordered Mother to stay 100 yards away from Father's house.

Marcela Perez testified she provided monitoring services for Mother from March 10 to June 20, 2010. During this period, Father cancelled only one visit, which was due to the child's illness. Perez testified that Mother terminated her services on June 20, after Mother had an outburst and accused Perez of "participating in the visit." Perez testified she feared for her safety. On cross-examination, Perez acknowledged writing a critical incident report about Father related to his failure to pay her fees. On redirect, Perez stated that she amicably resolved her issues with Father.

Ariane Dora Fleiderman testified she provided monitoring services for Mother for approximately six months in 2011. Fleiderman stated that during her last monitoring date, she terminated the visit early because Mother became increasing irritated during the visit, demanded that Fleiderman sit in a particular place, and stated that she would stand in front of Fleiderman holding the child for the remainder of the visit. Fleiderman stated she never felt threatened by Father.

During closing argument, the court asked Father's counsel to address why monitored visits should continue now that the minor child was older and could speak. After counsel argued that Mother still evinced hostility to Father, the court stated: "Other than thinking that the child is so delicate she can't afford to hear bad things about Dad, I am not hearing any reason for monitoring yet, not in the evidence that's been presented and the evidence is closed." Counsel responded by directing the court's attention to testimony about the recent November 2, 2014 incident, which counsel argued showed that monitoring should be maintained due to Mother's continued erratic behavior and her inability to place the child's interest before her own.

6

B.    *The Trial Court's Findings and Order*

After hearing argument and considering the evidence, the trial court made findings on the record. It found that both parents had certain strengths and weakness. "The evidence demonstrates Mother to be intelligent, articulate. She is resourceful. And clearly loves her daughter." However, the court found, Mother demonstrated "continued anger at Dad" and a "prismic view of facts," i.e., she "eliminate[s] some relevant facts or eliminates or changes the sequence of events to correspond with her view of the world." The court expressed concern over Mother's recent behavior, including her long absences from visiting the child (from April to August 2013) and the more recent November 2014 incident. The court concluded that "Mom's attempt to get into Dad's apartment building and her providing an outdated custody order to the police as the basis for her justification for the instructions she then received from the police" indicated that Mother "manipulated the situation in a way that is inconsistent with objective reality." The court noted its concern that "Mom believes those who disagree with her are her enemies or incompetent or are in [a] conspiracy against her."

As to Father, the court found that "the evidence shows that Dad is smart; that Dad has been consistent; that Dad has been child focused." However, Dad "has lacked dependable transportation," "still has some anger at Mom," and has "restrict[ed] Mom's access to their daughter." As to the last finding, the court explained that although Father had acted as "a gatekeeper in a restrictive manner," he had not engaged in any "custodial interference."

On March 24, 2015, the trial court issued an order modifying the February 16, 2010 custody and visitation order. The court ruled that Father would continue to have sole legal custody and primary physical custody of the child. Father was ordered to inform Mother in advance of all nonemergency decisions relating to the

7

child's health care, education, or welfare. The court also ordered that both parents have reasonable access to the child's school and to medical information from her school or medical providers.

The court found it was not in the best interest of the child to have unmonitored visits with Mother. The court held that monitored visits would continue under the following new terms. As to the selection of the monitor, Mother could choose any professional monitor, and Father would have 48 hours to complete the intake process. Father would be able to veto or dismiss a professional monitor only through appeal to the trial court. Alternatively, Father could select a nonprofessional monitor. Mother's parents were excluded from acting as monitors. As to the allocation of professional monitoring costs, Father would be responsible for 10 percent of the fees, Mother for 90 percent. If either parent were late for a visit, any late fee charged by the professional monitor would be the responsibility of the tardy parent. Finally, no monitor would be required for school events open to all parents, such as recitals and graduation ceremonies.

Mother was granted increased visitation rights, and her parents were provided an opportunity to accompany Mother during these visits.[3] The court also ordered that the custodial exchange take place at a designated McDonald's

---

[3]     Mother was granted the right to visitation every second, fourth and fifth Saturday and Sunday of the month, from 9:00 a.m. to 6:00 p.m. In addition, she was granted visits on all single day weekday school holidays, from 9:00 a.m. to 6:00 p.m. These school holidays included: Martin Luther King's Birthday, President's Day, Lincoln's Birthday, Cesar Chavez Day, Memorial Day, Labor Day, Columbus Day, and Veterans Day. During Spring Break, Mother was awarded additional visits each Monday and Wednesday, from 9:00 a.m. until 1:00 p.m. Each Christmas, she was awarded visits from 12:00 p.m. on December 24 through 9:00 a.m. on December 25. Mother was also awarded visitation on Easter Sunday in all odd numbered years, on the child's birthday in all odd numbered years, and on Mother's birthday every year.

restaurant located in Van Nuys, California, or a mutually agreed upon location. It further ordered that neither parent was to make, or allow others to make, derogatory comments about the absent parent within earshot of the child.

On May 22, 2015, Mother timely noticed an appeal from the March 24, 2015 custody and visitation order.

## DISCUSSION

As an initial matter, we note that Mother devotes much of her appellate opening brief to challenging the February 10, 2010 custody and visitation order. However, as noted, we previously considered Mother's challenges to that order, and affirmed the order in the prior appeal. (See *E.S. v. R.V.*, *supra*, B223635.) Thus, we consider only Mother's challenges to the March 24, 2015 custody and visitation order.

Mother contends the trial court erred in denying her request for sole legal and physical custody of the child. We disagree. "Once the trial court has entered a final or permanent custody order reflecting that a particular custodial arrangement is in the best interest of the child, 'the paramount need for continuity and stability in custody arrangements -- and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker -- weigh heavily in favor of maintaining' that custody arrangement." (*In re Marriage of Brown & Yan*a (2006) 37 Cal.4th 947, 956; see *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32-33.) Put simply, "a child should not be removed from prior custody of one parent and given to the other '"unless the material facts and circumstances occurring subsequently are of a kind to render it essential or expedient for the welfare of the child that there be a change."'" (*In re Marriage of Burgess*, *supra*, at p. 38, quoting *In re Marriage of Carney* (1979) 24 Cal.3d 725, 730.) This rule places a weighty burden on the noncustodial parent seeking to

9

persuade the court that a change in stable custody, lawfully acquired and maintained for a significant period, is in the child's best interest: "Under the changed circumstance rule, custody modification is appropriate only if the parent seeking modification demonstrates 'a significant change of circumstances.'" (*In re Marriage of Brown & Yana*, *supra*, at p. 956; accord *Burchard v. Garay* (1986) 42 Cal.3d 531, 536.)

We review the trial court's order denying modification of custody for abuse of discretion. (*In re Marriage of Burgess*, *supra*, 13 Cal.4th at p. 32; *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255.) Under that standard, "reversal is warranted only if there is no reasonable basis upon which the trial court could conclude that its decision advanced the best interests of the child." (*In re Marriage of Melville* (2004) 122 Cal.App.4th 601, 610.) "'An appellate tribunal is not authorized to retry the issue of custody, nor to substitute its judgment for that of the trier of facts. Only upon a . . . showing of abuse of discretion will the order of the trial court in such matters be disturbed on appeal. Where minds may reasonably differ, it is the trial judge's discretion and not that of the appellate court which must control.'" (*In re Marriage of Lewin* (1986) 186 Cal.App.3d 1482, 1492.)

Mother contends there was a significant change in circumstances, as Father frustrated her visitation rights. The trial court, however, found that although Father acted as "a gatekeeper in a restrictive manner," he did not engage in any "custodial interference" of Mother's visitation rights. That finding is amply supported by the record. Father's testimony indicated that he objected to distant visit sites (more than 30 minutes away from his home) in order to be able to arrive promptly to resolve any issues that might occur during the visits. Father also proposed alternate dates and locations for the visits. As attested to by Perez and Fleiderman, Father had a good relationship with the professional monitors, except for the latest

monitor, Spivak. He had a colorable reason for terminating Spivak's services, as she failed to stay in close proximity to the child during the visits to ensure proper monitoring. The trial court also found Father to be a fit parent -- smart, consistent, and child-focused. On this record, we find no abuse of discretion in the trial court's refusal to reverse the prior custody order and to grant Mother sole legal and physical custody.

Citing *Read v. Read* (1951) 103 Cal.App.2d 721, *In re Marriage of Ciganovich* (1976) 61 Cal.App.3d 289 (*Ciganovich*), and *Mark T. v. Jamie Z.* (2011) 194 Cal.App.4th 1115, Mother contends the trial court's finding that Father acted as a gatekeeper compelled the court, as a matter of law, to modify the custody order. The cases cited are distinguishable. As the trial court found, Father's conduct did not rise to the level of "custodial interference" with Mother's visitation rights, e.g., he did not move the child far away from Mother. (Cf. *Read v. Read*, *supra*, at p. 723 [trial court erred in failing to consider that custodial parent's move to a distant location would render it impractical for noncustodial parent to visit, as the move constituted "a sufficient change in circumstances"]; *Ciganovich*, *supra*, at p. 294 [mother's move to another state to frustrate father's visitation right furnished "ground for a motion to modify the decree which the court should consider as part of the array of circumstances affecting custody and support"]; *Mark T. v. Jamie Z.*, *supra*, at p. 1131 [mother's proposed move to another state, if made in bad faith, is a factor for the trial court to consider: "'"Conduct by a custodial parent designed to frustrate visitation and communication *may be grounds for changing custody*"'"].)

Mother also contends the trial court erred in denying her request to modify the visitation order, arguing that frustration of her visitation rights was not in the best interest of the child. (See *In re Marriage of Lucio* (2008) 161 Cal.App.4th

11

1068, 1072 [visitation orders may be modified based on the best interest of the children without proof of the significant change of circumstances required to modify custody]; accord, *Enrique M. v. Angelina V.* (2004) 121 Cal.App.4th 1371, 1378-1382 [court erred in applying changed circumstance rule to request for change in visitation].) In the instant case, the trial court modified the prior visitation order to address Mother's concerns. Both parents were granted access to information about the child's health care, education, and general welfare. Father could veto or dismiss a monitor only through an appeal to the trial court. Mother was granted increased visits, and her parents were given an opportunity to attend the visits.

Mother contends the trial court should have discontinued monitoring, arguing no evidence suggests that she was a danger to the child. Here, the trial court found that it was not in the best interest of the child to have unmonitored visits. An appellate court does not generally interfere with a trial court's discretionary determination that a change in visitation is not in the best interest of the child; however, a discretionary visitation order may be reversed if the trial court applied "improper criteria or incorrect legal assumptions . . . ." (*Mark T. v. Jamie Z.*, *supra*, 194 Cal.App.4th at pp. 1124-1125.) As the trial court reasonably concluded, Mother's recent behavior supported continued monitoring. Specifically, Mother's November 2014 attempt to conduct a visit with the child at Father's residence after the monitor had cancelled demonstrated that Mother's view of facts was inconsistent with objective reality. Although Mother knew that a monitor was required to be present for her visits and that her parent could not act as a monitor, she provided incomplete information to the police and then relied on the police instruction to justify her attempt to access Father's building and visit the

12

child without a court-approved monitor.  On this record, we find no abuse of discretion in the trial court's maintenance of monitored visits.

**DISPOSITION**

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

MANELLA, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.

13