Filed 2/2/24  In re E.T. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re E.T., a Person Coming Under the Juvenile Court Law. | B321896 consolidated with B326145<br><br>(Los Angeles County Super. Ct. Nos. 21CCJP02476, 21CCJP02476A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>V.V. et al.,<br><br>    Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Nancy A. Ramirez, Judge. Affirmed in part, reversed and remanded in part.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant V.V.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant M.T.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Kim Nemoy and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

---

Father M.T. and mother V.V. appeal from multiple findings and orders made by the juvenile court regarding their daughter, E. In October 2021, the juvenile court found jurisdiction over eight-year-old E. pursuant to Welfare and Institutions Code section 300, subdivision (b),[1] sustaining allegations that father and mother failed to provide proper medical care for E. and that father abused marijuana. After multiple continuances of the disposition hearing to obtain medical and educational reports, in June 2022 the court ordered continued joint physical custody of E. but granted sole legal custody to mother. Six months later, the court terminated jurisdiction, with an exit order granting joint physical custody of E. to mother and father and sole legal custody to mother.

Mother and father separately appeal from the October 2021 jurisdiction order, the June 2022 disposition order, and the December 2022 custody exit order. Father first challenges the juvenile court's assertion of jurisdiction, arguing that the court

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

lacked substantial evidence to find a risk of harm to E. Second, he contends that the court erred in failing to grant joint legal custody. We find no error in these orders and therefore affirm them.

Mother no longer challenges the court's jurisdiction or disposition orders. Instead, her appeal focuses solely on the December 2022 exit order. She argues that the court ignored her request for primary physical custody of E. so that she could relocate with the child to Colorado. We agree with mother that by preserving the status quo and ordering joint custody, the court failed to properly consider what custody order would be in E.'s best interest if mother did relocate. This was error. We therefore reverse the December 2022 custody order and remand the matter to the family court for further proceedings.

## BACKGROUND

### I. Prior Referral

E. was born in 2013 and is the only child of mother and father. Mother and father separated in approximately 2017. Shortly afterward, E. began living with father in Los Angeles, while mother lived in Colorado. The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in December 2020, from a referral alleging neglect by mother and father. At that time, father said E. had not seen a pediatrician since she was a baby. At DCFS's urging, father took E. to the pediatrician in January 2021 and received a referral to a specialist for congenital microtia, a condition in which the outer ear is not fully formed.

E. also received a psychological evaluation in February 2021 and was diagnosed with autism spectrum disorder. The psychologist recommended that E. participate "in a regular

3

education program with support services," communication therapy and social therapy. Father told DCFS that E. was not enrolled in school because she was not verbal and could not communicate. A DCFS children's social worker (CSW) explained to mother and father the importance of obtaining follow up care for E. Father agreed to ensure E. was getting necessary services and DCFS closed the referral.

## II.  Referral and Petition

DCFS received the referral leading to the instant case in April 2021, alleging emotional abuse and medical and educational neglect of E. by father. The reporting party stated that father kept E. isolated in her room all day, E. did not attend school, father refused to discuss E.'s care with mother, and father did not allow mother to see E.

DCFS reported that mother and father had been aware of E.'s microtia since birth but the child had not received any treatment, which could explain her limited verbal skills. The parents had also failed to provide a medical case plan for E. and father had not completed any of the indicated medical follow-up appointments since the last referral closed early in 2021. DCFS expressed concern as to whether father would continue to follow through with medical care for E. and with E's possible isolation by father.

A CSW visited father's home on April 12, 2021. Father reported that mother had a history of violence against him and E. According to father, E. had been living with him for the past three years, she was happy with him, and had only "bad memories" of mother. Father told the CSW that in December 2020, mother began telling E., "I'm coming to get you." After that

4

contact, E. was scared of mother and did not want to speak to her.

Father stated that E. had been assessed by the Regional Center earlier that year and that its representative told him that E. was "getting whatever she needed." When the CSW asked about socialization for E., father stated that prior to the pandemic, he would take her to the park and beach once a week, and the desert every two weeks. Father told DCFS that his home was a certified home school. He stated that E. had only twice expressed wanting to go to public school. Father explained that he was trying to prepare E. for high school by teaching her his trade, using "hands-on observation and experience" and "project-based learning." As an example, father explained that E. had helped him build houses in the desert, which he called "experimental learning."

Father told DCFS that he last took E. to the doctor two or three months ago; prior to that, he had never taken her to the doctor because she was never sick. DCFS noted that father had received a recommendation to schedule a follow up appointment for E.'s microtia in January, but did not do so until prompted by the CSW in the current investigation.

Father denied being the aggressor in any domestic violence incidents with mother, but stated that mother often accused him in instances where she was the aggressor. He denied mother's other allegations, including that he had raped her. He denied any substance abuse; he drank alcohol once a week and smoked marijuana, but kept it out of reach of E.

The CSW also spoke with E. but was unable to get clear responses. When asked if she wanted to go to mother's home, E.

replied "no." The CSW observed that E. appeared to be very attached to father.

Mother emailed DCFS on April 26 with a link to a folder of documents purportedly supporting her claims of abuse by father, including recordings of phone calls with E. She stated that she was moving back to Los Angeles and had already secured employment there. Mother claimed that in 2020 father would not let her see E. Conversely, father claimed that in December 2020, mother threatened to take E. from him. Mother admitted smoking marijuana daily for help with her epilepsy. She reported that father drank alcohol and was a "marijuana addict." She also said father was very antagonistic toward medical care. In late April 2021, both parents tested positive for marijuana.

The CSW spoke with father again on May 5, 2021. Father stated he did not plan to accept Regional Center services, that it did not seem necessary, and was "for the less fortunate" and for "problematic people." Father submitted videos of E. to DCFS that he contended showed she was "consistently happy and outgoing."

E. had a routine medical examination on May 6, 2021, which was normal except for noting the left ear congenital microtia. Father declined mental health services and immunizations. The doctor recommended a routine dental examination, an optometry exam, and referral to an ear, nose and throat specialist (ENT).

On May 13, 2021, the Regional Center reported to DCFS that E. was eligible for services based on her autism diagnosis. The report recommended routine pediatric and dental care, an individualized education plan (IEP), and a full cognitive assessment.

Father told DCFS that he did not schedule an appointment with an ENT because E. had the "hearing of a safecracker in both ears" and he wanted to wait until custody issues were resolved. Father also claimed that E.'s doctor agreed that her microtia "was not such an existential threat as the one she currently faces with her mom."

DCFS filed a dependency petition on May 25, 2021 on behalf of E. under section 300, subdivisions (a) and (b).[2] In counts a-1 and b-1, the petition alleged that mother and father had a history of violent altercations in E.'s presence, including in 2016 when mother struck father's head, causing him to lose consciousness. Count b-1 further alleged that father failed to protect E. by allowing mother to have unlimited contact with the child.

The petition alleged in count b-2 that mother and father had failed to obtain necessary medical treatment for E.'s

---

[2] Section 300 states, in relevant part, "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:[¶](a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. . . . [¶] (b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following: (A) the failure or inability of the child's parent . . . to adequately supervise or protect the child. . . . [¶] (C) The willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter, or medical treatment. [¶] (D) The inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse."

microtia. Counts b-3 and b-4 alleged substance abuse by mother and father, respectively, including that both parents had a history of substance abuse and were current abusers of marijuana, which rendered them incapable of caring for E.

At the May 2021 detention hearing, the court found a prima facie case for jurisdiction over E. under section 300. The court ordered E. released to father, with visitation for mother. At a continued detention hearing the following month, DCFS clarified that it recommended releasing E. to both parents, not just father, and the court modified the order accordingly. The court also ordered the parents to ensure E. was receiving Regional Center services, and to follow up as to all medical and dental appointments.

## III. Jurisdiction/Disposition Report

At a meeting on July 7, 2021, mother and father agreed to an alternating three-day custody schedule. The CSW observed E. play with mother and noted that they were affectionate with each other.

In its July 2021 jurisdiction/disposition report, DCFS stated that E. appeared happy in the care of each parent. As to the allegations of the petition, mother denied domestic violence against father and contended that father was "the abusive one." She also denied abusing marijuana and stated that she had a prescription to use marijuana for seizures.

Father contended that mother had been abusive toward him and E. and denied that he had engaged in any violence. He denied any history of using drugs. Father claimed that he and mother were told when E. was born that her microtia would not need attention until she was seven years old. He also stated that

E. had always been healthy so there was no need for her to see a doctor.

DCFS reported in August 2021 that mother and E. had started conjoint counseling. The therapist observed that E. was happy, comfortable, and affectionate with mother. Mother reported domestic violence and concerns of father's possible abuse of E. to the therapist.

DCFS also received the report from E.'s ENT examination. The doctor stated that he had discussed options with father regarding E.'s condition, including surgery and a hearing aid. Father responded that E. did not have a hearing problem and he was not interested in those options. The ENT staff told DCFS that it would be unusual for a child with E.'s condition to have normal hearing on the affected side, and that father was informed that the hearing aid would help E. determine where noise was coming from, but father refused further treatment. Father had not made any follow-up appointments. Additionally, father had not provided mother's contact information to the ENT or pediatrician. At mother's request, a hearing test was scheduled for E.

DCFS recommended that the court order an evaluation under Evidence Code section 730 (730 evaluation) "[d]ue to the complexity of this case." DCFS observed that the parents continued "to be unable to co-parent" or agree on a plan for E. DCFS reported that father "has been defensive and questions every appointment," and claimed E. had already had a hearing test, although no records of such a test were found. DCFS also observed that E.'s communication, eye contact, and ability to socialize with other children was limited.

DCFS reported that father was not following the previously agreed upon schedule for exchanging custody of three days with each parent. Each parent claimed that E. did not want to see the other parent, and that the other parent was violating the agreement.

## IV. Adjudication and Disposition

At a hearing on August 4, 2021, the court ordered father to comply with the custody schedule and ordered both parents not to discuss the case with E. The court also set the adjudication hearing for contest on October 1, 2021. On August 12, 2021, mother filed a request that the court allow mother to enroll E. in in-person schooling. Mother stated that father was refusing to cooperate, instead insisting that E. continue her home-schooling with him.

At the court's request, DCFS filed a last-minute information on September 3, 2021 addressing an education plan for E. DCFS noted that both parents held educational rights for E., but the department was concerned that father had not provided a curriculum detailing what he was teaching E. DCFS also noted mother's objection to continued home schooling. DCFS attached a "school report" submitted by father discussing his "tailored education program" for E. Father also filed a motion requesting that the court find that continued home schooling was in E.'s best interest. E.'s counsel opposed this request.

At a progress hearing on September 10, 2021, the court ordered an IEP for E. At the request of E.'s counsel, the court designated mother as the educational rights holder for the child pending adjudication, so that mother could enroll E. in school and start the IEP process.

DCFS filed a last-minute information on September 20, 2021, reporting that E. had a dental examination on July 16, which showed no cavities. The ENT who had seen E. in August stated that E. currently did not need treatment but she was a candidate for a hearing aid, which might or might not help her. E. was scheduled for a hearing test on October 12. E. was also seen by a pediatrician on August 19, 2021, who recommended another follow up with an ENT specialist after the hearing test. The doctor noted that E.'s immunizations were not up to date, but that mother and father were not in agreement on this issue.

E. was scheduled to start adaptive skills training with the Regional Center in early September, but the coordinator reported that the scheduled provider could not take the case because of the need for toilet training. The coordinator was attempting to locate another provider.

DCFS also reported that the parents had been adhering to the custody agreement of three days each, but that they continued to "struggle to co-parent effectively." On September 21, DCFS reported that E.'s IEP was not yet complete because the parents had not submitted the required application. Mother told DCFS that she had submitted her form on September 14. At a progress hearing on September 24, 2021, the court again ordered an IEP for E., and also ordered that E. must be enrolled in school. Mother informed DCFS that she had completed parenting, domestic violence, and drug and alcohol awareness classes the same month.

In an October 5 last-minute information, DCFS reported that it was helping mother locate a special education advocate at mother's request. The parents had completed the IEP application, but it remained pending. DCFS also reported that E.

started attending public school on September 28, 2021. In late October, DCFS reported that E. continued attending public school and had an incident of hitting herself at school on October 15. Father continued to request that mother allow him to home school E., but mother refused. According to mother, father repeatedly stated he would stop interfering in mother's education plan for E. if mother agreed to relinquish E.'s medical rights to him.

E. had a hearing test on October 12, which found that she had "severe to moderate conduction loss" on her left side. The doctor recommended annual monitoring, consideration of preferential classroom seating at school, and consideration of a hearing aid if there were communication concerns. E.'s pediatrician also recommended that she be vaccinated. Mother agreed; father did not. E. was otherwise developing well.

Mother requested a mental health referral through E.'s school on October 14. E. had a mental health screening on October 20, with reported symptoms of hitting herself, hand flapping, becoming tired and easily distracted, as well as worry and sadness. E. was referred for autism services.

In a last-minute information on October 25, 2021, DCFS reported that father tested positive for marijuana on September 29. Father took E. to the police station on October 15, stating that E. told him mother hit her. DCFS reported continued concern with father's mental health and substance abuse, noting increasing marijuana levels.

E.'s therapist reported seeing mother and E. for 12 conjoint therapy sessions from July to October 2021. She stated that E.'s overall demeanor was playful and happy, but she was unable to acknowledge when she was upset and refused to answer

questions about school.  The therapist reported that E.'s concentration appeared improved after she started school.

The court held the adjudication hearing on October 27, 2021.  The court dismissed from the petition counts a-1 and b-1 alleging domestic violence, finding that mother and father were no longer together and there was no evidence of a current risk to E. from violence.  The court also dismissed count b-3 alleging substance abuse by mother, finding that although the court "has concerns regarding mother's substance abuse or use of marijuana," it did not rise to the level required to sustain the count.  The court sustained the petition as to count b-2 alleging medical neglect and count b-4 alleging substance abuse by father, finding that DCFS had proven the allegations by a preponderance of evidence.  As to father's marijuana use, the court stated it had "a significant concern" regarding father's ability to provide regular care for E. and the probability that his marijuana use endangered E.  The court also noted that father's marijuana levels during drug testing were "very high."  Thus, the court found jurisdiction over E. under section 300, subdivision (b). The court ordered a 730 evaluation, continued substance testing for both parents, and gave mother authority to proceed with vaccinating E.  The court denied father's request to reinstate his educational rights, finding that "the parents are still in conflict" and the court did not want to interrupt the progress of the current evaluations or cause other issues.  The court continued disposition, and subsequently continued disposition several more times while waiting for receipt of additional reports and further testing.

In a December 2 last-minute information, DCFS reported that mother did not appear for scheduled drug testing on two

13

dates in November, and father twice tested positive for marijuana. The principal of E.'s current school stated that father had brought up concerns that E. was being abused by her teacher, but the principal's investigation found no abuse. The principal told DCFS that he believed 95 percent of what was happening was due to family issues, but that he thought E. would do better at a school with additional support resources. He stated that father was lobbying to home school E. for one or two days per week, but that the school could not permit that. E.'s IEP meeting was scheduled for the following week. E. was also scheduled to begin individual therapy, and mother reported that she had successfully requested to transfer E.'s Regional Center services to the area where mother was living.

The CSW also spoke to the ENT staff, who stated that when the parents came in for the appointment, the staff was "very close to contacting the social worker as the parents were not on the same page." Father "stormed out" of the office and was not present for the referral to the audiology department for a hearing aid.

Mother reported to DCFS that there was an incident during a custody exchange on November 14, during which father restrained E. and prevented her from walking to mother. After mother threatened to involve police, father let E. go and drove away. Mother also stated that E. was distressed due to father's "aggressive behavior in the car," and that there had been two other "less volatile incidents" during the prior two exchanges, including "a bribe attempt in addition to intimidation." Mother stated she and father had agreed to Monday school drop offs as alternate exchanges, since father "seems particularly triggered by my presence." DCFS reported that the following exchange on

14

November 24 proceeded without incident, and E. appeared to be doing well. DCFS advised the court that it continued to have concerns about the parents' behavior and "the extra stress they are putting on the child," as they continued to make allegations against each other.

At a progress hearing on January 10, 2022, the court granted mother's motion to appoint her as the holder of educational rights for E.

E. received her vaccinations in December 2021 and had a follow up appointment in January. She was also scheduled to have a forensic examination after mother reported to the doctor that E. stated her vagina hurt. In January 2022, DCFS reported that the police had completed the forensic investigation, including observing E. around father, and concluded that the allegations of abuse were unsubstantiated. Instead, the reporting officer stated that there was a "feud going on and child custody battle and that's pretty much what we see." Mother again reported possible sexual abuse or "grooming" of E. by father on January 5, 2022. DCFS reported that E.'s doctor and the CSW found no indication of abuse.

Mother tested positive for marijuana twice in December 2021. Father tested negative. Mother stated she was prescribed marijuana by her doctor. DCFS also reported that each parent continued to blame the other parent for the issues in the family.

Mother told DCFS that she did not want father to be present for E.'s IEP meeting given his ongoing objection to E.'s schooling. Mother attended the initial IEP meeting on January 11, 2022. The assistant principal told DCFS that father was excluded after mother and her counsel both told the school that mother was the educational rights holder and did not want to

15

include father at the meeting. DCFS also reported that mother had expressed her reservations about co-parenting with father and that she preferred father not be involved, but she had enrolled in parenting classes and a high-conflict parenting program in an attempt to co-parent with father.

On January 27, 2022, DCFS reported that mother requested a deaf/hard of hearing evaluation, which would take additional time to complete. The assistant principal stated that father attended the second IEP meeting in January and both parents were able to stay on topic. She stated that they addressed with the parents the concern that E. was not doing well academically and was not turning in homework, but the parents did not want to discuss that issue. Father complained that it took two hours to drive E. to school, and requested that the custody exchange be modified so that he would have E. on the weekend, while she would stay with mother during the week for school. The court ordered this change.

At a March 2022 IEP meeting, E.'s school stated that E. had made progress in reading. E.'s teacher reported that E.'s most challenging behaviors included when she was disruptive, sometimes yelling and crying, that she had trouble with social cues, and she did not want to complete schoolwork.

Recently, the parents had each taken E. to a different optometrist, with different results. Mother told the optometrist that E. had been complaining of headaches and squinting and the optometrist recommended glasses. Father did not report these symptoms during E.'s second optometry examination. He claimed no glasses were needed, that E. "has no problems seeing things," and accused mother of "medical abuse."

16

DCFS reported to the court that the parents continued to be unable to co-parent. Mother had "shown commitment, dedication and efforts to ensure that the child has needed services and support," but father "continued to have difficulties with assisting [E.] in identified areas such as school." Because E. was having difficulties with transitions, DCFS recommended both parents participate in helpful activities, including homework and encouraging E. to go to school.

In a last-minute information filed May 9, 2022, DCFS reported that E. had recently transitioned to an autism core program in a new school. DCFS also received the 730 evaluation on April 24, 2022. The psychologist recommended that the parents continue to share physical custody of E. She noted that E. had been raised primarily in father's custody and was securely attached to father, so that any further separation would likely lead to further emotional and behavioral problems. At the same time, E. was also attached and bonded to mother. The report also recommended fewer phone calls with the other parent during their non-custodial time in order to assist E. in adjusting and causing less emotional distress. She also recommended that mother retain medical and educational rights for E., because the parents were unable to come to an agreement on decisions and mother had demonstrated awareness of E.'s special needs and an ability to advocate for services. She noted that because of home schooling, E. had missed "years of special education services that may have made a difference in her overall development," and that father's "view of Western medicine has kept [E.] from receiving preventive health services" for the first seven years of her life.

In April, mother completed a high conflict co-parenting program. The therapist reported in May that mother and E. continued to attend conjoint therapy sessions and their relationship appeared "healthy and typical." When asked about her new school, E. responded, "best school ever."

The court held the disposition hearing on June 27, 2022. Father testified that E. was not vaccinated prior to DCFS involvement because he was worried she had a high risk of an allergic reaction. He also said E. had previously been diagnosed as autistic by multiple people, including his mother, who was an "expert in autism." He decided to home school E. because he felt she was "not quite ready for elementary school." He thought that E.'s current public school was "wonderful." He was not opposed to that school and felt it was able to meet her needs. He had tried to stay involved in E.'s educational decisions. However, he also expressed "concerns" with E.'s current education, testifying that E. was "a savant" and a "standard public school education cannot be tailored to her special abilities," so he was requesting partial home schooling.

Father acknowledged that during the four years prior to the case he did not seek a Regional Center assessment for E., did not have E.'s hearing assessed, and did not take E. to see a pediatrician. As of May 2021, E. had never seen a dentist. DCFS suggested that E. see an optometrist in January 2021, but he did not take her to see one until after mother did so, because he disagreed with the prescription. He continued to insist that E. had "the hearing of a safecracker," but denied that he claimed that was true as to both ears. Regarding the psychological evaluation conducted in February 2021, he denied that the psychologist recommended enrolling E. in a standard education

18

program with support services. He contended that the psychologist told him orally that E. would not be suited for a "sit down formal learning environment." He also contended that the Regional Center told him "over the phone" that there were no beneficial services available for E.

When asked during cross-examination what he and mother were unable to agree on, he listed E.'s need for a hearing aid, glasses, braces, timing of vaccinations, and enrollment in general education. Father testified that on all of these topics his opinion was "confirmed by professionals, medical experts."

Father's counsel requested that the court reinstate joint educational and medical rights for E. to father. Mother requested that she retain sole educational and medical decision-making rights. She also requested that she have custody one weekend per month. E.'s counsel agreed with DCFS's recommendation that mother retain sole legal custody, so that E. could "continue to receive consistent services in a structured setting." Counsel for DCFS pointed to the 730 evaluation's recommendation for one parent to hold decision making rights due to the parents' inability to work together and argued that mother had done an effective job thus far.

The court observed that both parents loved E., both were bonded to her, and that E. had lived with both for "significant periods of time." However, the court found that the parents "really struggle to get along and to put their differences aside in the best interest of this child," noting that father had testified to disagreement with mother on "just about every aspect of the child's medical care." The court stated it was also clear that E. was "suffering from stress and anxiety, likely resulting from the constant disagreement by the parents," including mother and

19

father accusing each other of abuse, calling the CSW and the police, and recording E. The court also found that father had delayed in getting services for E. to a degree that "could be detrimental to her ability to benefit from these services."

The court found that continued jurisdiction was warranted but that there were reasonable services available to prevent removal. As such, the court indicated it would follow the recommendation of the 730 evaluation to release E. into the physical custody of both parents, but for mother to retain sole medical and educational rights. The court also denied father's request to allow him to home school E. in place of at least one day of weekly public school instruction. The court stated it was considering mother's request for some weekend custodial time, in order to have some time with E. that was more relaxed, but stated that counsel should discuss with both parents what arrangement could be acceptable to them both.

Mother and father timely appealed from the disposition order.

## V. Termination of Jurisdiction

In a December 2022 status review report, DCFS reported that E. continued to "demonstrate significant progress in various areas, including socialization, behavioral, and education." DCFS also stated that E.'s needs were being met by both parents and there were "no further concerns for this child at this time." E. appeared to be happy and she enjoyed spending time with both parents. Mother had been very supportive of E.'s needs and made significant progress in her case plan. Mother stated that communication with E.'s father continued to be extremely limited. Father had also shown that he was "deeply concerned and devoted to E[.]'s needs." He had completed almost all of the

recommended court orders, including high conflict parenting classes.

DCFS also reported that E. was up to date on her medical examinations and immunizations, and that mother had applied for a hearing aid for E. E. also continued to benefit from Regional Center services, including a social skills program. E. reported enjoying school and her teacher confirmed that E. was excelling academically. E. had also transitioned from conjoint therapy with mother to individual therapy. E. remained living with mother during the week and one weekend per month, and with father from Friday afternoon until Monday morning.

DCFS reported that father continued to feel that mother exaggerated the need for various services for E., including optometry, Regional Center services, and therapeutic services. Mother reported that she tried to work with father and include him, but father refused to participate.

DCFS concluded that both parents were providing E. with the loving care she needed, but they had been unable to communicate effectively regarding issues related to E.'s care. DCFS recommended terminating jurisdiction with the current custody arrangement in place.

In her trial brief, mother argued among other things that it was in E.'s best interest to award sole physical custody to mother and allow mother and E. to move to Colorado. She argued that she had maternal relatives there and that the education system and support systems available there were superior to those in Los Angeles. Mother also submitted a ten-page "formal request for court ruling re: relocation," detailing the bases of her request to return to Colorado with E.

At a progress hearing on December 23, 2022, the court indicated it had read and considered the reports submitted by DCFS, as well as mother's trial brief, in which she requested "sole legal and sole physical custody as she wishes to move with the child to Colorado." E.'s counsel agreed with DCFS's recommendation to close the case, and requested sole legal custody to mother and joint physical custody. Father's counsel asked the court to close the case with joint legal and physical custody. Mother's counsel argued that mother should be able to move with E. to Colorado, as there were better services and support available there. However, she also stated that if the court was inclined to order joint physical custody, mother requested that the current custodial schedule remain in place.

The court noted that mother had held sole educational rights since January, and during that time she had enrolled E. into services and made sure E. was being properly assessed and that her health and developmental issues were being addressed. Thus, the court found it was in E.'s best interest for mother to retain sole legal custody. As to physical custody, the court found that E. "spends as much as . . . 50-50 time with the parents. Granted it doesn't work out perfectly 50-50 . . . [b]ut what the court is saying is that the child spends a lot of time with both parents. She is bonded to both parents. And the court is finding that it would be in the child's best interest for the parents to have joint physical custody."

Accordingly, the court found that continued supervision was no longer necessary. The court entered a final judgment terminating jurisdiction with a custody order awarding sole legal custody to mother and joint physical custody to mother and father. The court ordered the physical custody arrangement to

22

remain the same, with father having custody from Friday after school to Monday morning, mother having custody during the week, and mother having custody one weekend per month.

Mother and father both appealed from the court's December 23, 2022 orders. We consolidated the appeals for the purposes of briefing, oral argument, and decision.

## DISCUSSION

### I. Jurisdiction

In his appeal from the disposition order, father argues that the evidence was insufficient to support the juvenile court's jurisdictional findings because there was no substantial risk of harm to E. due to father's delay in seeking medical treatment for her or his use of marijuana. We find no error and therefore affirm.[3]

### A. Governing Principles

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the

---

[3] Although mother initially appealed from the court's jurisdiction and disposition orders, she concedes that those issues are moot given the court's subsequent order terminating jurisdiction. However, neither DCFS nor father addressed the mootness issue as to father's jurisdictional challenge. (*See In re Alysha S.* (1996) 51 Cal.App.4th 393, 397 ["[A] jurisdictional finding good against one parent is good against both."].) Because father argues that the court's jurisdictional and dispositional findings led to the erroneous custody order, we proceed to consider father's jurisdictional claim.

light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773, citation omitted.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. "'[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence ... such that a reasonable trier of fact could find [that the order is appropriate].'"'" (*Ibid*., citations omitted; see also *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228 ["The [order] will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence."].)

As relevant here, a dependency court may determine a child is subject to the court's jurisdiction under section 300, subdivision (b) if it finds by a preponderance of the evidence that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness," as a result of a parent's failure or inability to adequately supervise or protect the child or failure to provide medical treatment. (See § 300, subds. (b)(1)(A) & (b)(1)(C).) Where the child has not suffered actual harm, the evidence must establish "'that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm.'" (*In re A.G.* (2013) 220 Cal.App.4th 675, 683.)

The court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.) "'The purpose of dependency proceedings is to prevent risk, not ignore

it.'" (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.) The court may consider past events in deciding whether a child currently needs the court's protection. (*Ibid.*) A parent's "'[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383–1384, quoting *In re S.O.* (2002) 103 Cal.App.4th 453, 461.) However, evidence of past conduct, without more, is insufficient to support a jurisdictional finding under section 300. "There must be some reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135–136, abrogated on other grounds by *In re R.T.* (2017) 3 Cal.5th 622, 628.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.)

### B. Analysis

Father argues that the court erred in finding jurisdiction over E. pursuant to section 300, subdivision (b), premised on his failure to obtain medical care for E. Specifically, he contends that because E. did not require surgery or a hearing aid for her microtia, his failure to timely seek treatment for that condition did not establish a risk of harm. We disagree.

Substantial evidence supported the juvenile court's finding that father failed to seek recommended medical care for E. for the majority of her life. At the time of DCFS's initial intervention in December 2020, E. (then seven years old) had not seen a pediatrician since she was a baby and had never seen a dentist. Mother also reported that father had been resistant to medical treatment since she was pregnant with E. Further, although father had been aware of E.'s microtia since birth, he never

25

sought a professional assessment of her ongoing needs or any treatment. In January 2021, at the urging of DCFS, father obtained a referral to an ENT for evaluation of E.'s microtia. DCFS explained the importance of obtaining medical care for E. and closed the referral when father agreed to follow up.

Despite father's promises, he had done nothing further when DCFS received another referral in April 2021. He had not followed up with recommendations by DCFS and medical professionals that E. needed routine pediatric and dental care, as well as immunizations and an optometry exam. E. had a medical exam in May 2021 and the doctor again referred her to an ENT. She did not see the ENT until August, at which time father continued to insist that she had no hearing issues. The hearing test was ultimately scheduled by mother and occurred in October 2021, revealing hearing deficits on E.'s left side, which father continued to deny. Similarly, E. did not see a dentist until July 2021 and did not receive her immunizations until sometime in 2022, after mother obtained a court order allowing them.

The evidence also demonstrated that father's longstanding failure to seek recommended medical care for E. was intentional. Father was resistant to care throughout the case, insisting that E. did not need medical care because she was healthy and never sick, and therefore did not need immunizations, braces, hearing support, or glasses. DCFS noted that father was defensive as to every suggested appointment and repeatedly suggested that E. did not need services. Father refused the recommendations of medical professionals and insisted that he alone knew what care E. required.

Father suggests that he sufficiently followed DCFS's recommendations regarding treatment, pointing to E.'s visit to

the pediatrician in January 2021. But the record establishes that visit was only for the purpose of obtaining an ENT referral; it did not include a physical examination. E. did not have a routine well-child examination until four months later, after DCFS intervened a second time. Thus, substantial evidence supported the court's conclusion that without court oversight, father likely would continue to resist obtaining any medical care for E.

We also reject father's contention that dependency jurisdiction was unwarranted because E. had not been harmed by father's failure to obtain medical treatment. The court need only find that E. was subject to a substantial risk of harm in order to assume jurisdiction to protect the child. (See *In re N.M.*, *supra*, 197 Cal.App.4th at p. 165.) The evidence that father resisted all medical care for E. for most of her life, despite contrary recommendations and a known congenital condition, was sufficient to allow the court to conclude that father's neglect placed E. at a substantial risk of serious harm. (See *In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169 [jurisdiction proper where "[e]vidence in the record indicates the parents, at the time of the hearing, were not capable of exercising or willing to exercise proper medical care"].) As such, we find no error in the court's exercise of jurisdiction based on father's medical neglect.[4]

---

[4] Because we affirm the juvenile court's jurisdictional findings under section 300, subdivision (b)(1) based on the allegations of medical neglect, we need not reach father's contention that the court lacked substantial evidence to sustain the allegations of father's marijuana abuse. (See *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 ["an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by

## II. Custody

Both parents challenge the juvenile court's custodial exit order. Father argues that the court erred in granting sole legal custody to mother at the time it terminated jurisdiction. Mother contends that the court failed to consider her request to relocate with E. to Colorado. We find no abuse of discretion in the court's order regarding legal custody. However, as to physical custody, the court was required to determine what custodial arrangement would be in E.'s best interest *assuming* mother relocated to Colorado. Instead, the court ordered the parents to continue their prior arrangement with mother having custody of E. during the week, plus one weekend per month, and father having custody the remaining weekends. Because the court failed to properly analyze mother's relocation request, we remand the matter to the family court to make that determination.

### A. Legal Principles

Section 362.4 governs the termination of juvenile court jurisdiction and related orders. The statute authorizes a juvenile court to make custody and visitation orders upon terminating dependency jurisdiction over a child. (§ 362.4, subd. (a).) These exit orders remain in effect until modified or terminated by a subsequent order of the superior court. (§ 362.4, subd. (b); see also Cal. Rules of Court, rule 5.700.)

"When making a custody determination under section 362.4, 'the court's focus and primary consideration must always be the best interests of the child.'" (*In re T.S.* (2020) 52

the evidence"]. We also find that father's contention that the court erred by granting sole legal custody to mother at the disposition hearing is moot. We address this claim below in the context of the court's custodial exit order.

Cal.App.5th 503, 513, quoting *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268 (*Nicholas H.*).) The court must be guided by the totality of the circumstances and issue orders that are in the child's best interests. (*In re Chantal S.* (1996) 13 Cal.4th 196, 201 (*Chantal S.*).) "The juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of a child's circumstances when making decisions regarding the child." (*Ibid.*) Because juvenile dependency proceedings arise when children are subject to or at risk of abuse or neglect, "[t]he presumption of parental fitness that underlies custody law in the family court just does not apply. . . . Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions." (*In re Jennifer R.* (1993) 14 Cal.App.4th 704, 712 (*Jennifer R.*); accord *Chantal S., supra*, 13 Cal.4th at p. 206.)

"[T]he juvenile court has broad discretion to make custody [and visitation] orders when it terminates jurisdiction in a dependency case (§ 362.4)." (*Nicholas H., supra*, 112 Cal.App.4th at p. 265, fn. 4.) We review the juvenile court's exit orders for an abuse of that discretion. (See, e.g., *In re Maya L.* (2014) 232 Cal.App.4th 81, 102; *Jennifer R., supra*, 14 Cal.App.4th at p. 711; see also *In re Stephanie M.* (1994) 7 Cal.4th 295, 318 ["[W]hen a court has made a custody determination in a dependency proceeding, "'a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.'""].)

29

### B. Father's challenge

Father contends that as of December 2022, it was not in E.'s best interest to award sole legal custody to mother. He has failed to demonstrate any abuse of discretion.

Father's argument is premised on his assertion that he had become cooperative with DCFS's recommendations for E.'s medical and educational needs over the course of the case and that he had valuable insight to offer E.'s providers. The first claim is not supported by the record. Up to the time of termination, father continued to insist that E. did not need many of the services or medical support provided, and that mother was practicing medical abuse by, for example, obtaining glasses for E. at the recommendation of an optometrist. The court granted sole medical and educational rights to mother after the evidence suggested that the parents could not work together to make important decisions for E. and that father was resistant to most recommendations regarding E.'s medical and educational needs. Once mother assumed sole legal custody, she secured mental health services for E., and Regional Center support for E.'s autism; she followed up regarding E.'s medical needs, including glasses and a possible hearing aid; and she followed the recommendations by DCFS and the psychologist to enroll E. in public school with an IEP in place. At the time of termination, mother's efforts had resulted in placement for E. in a school that she loved, E. had begun to excel academically, she was up to date on her medical examinations and immunizations, and she was regularly receiving support for her special needs. As such, it was not an abuse of discretion for the court to conclude that it was in E.'s best interest for sole legal custody to remain with mother.

Father's second claim that he could not provide any insight into E.'s needs without having shared legal custody is not supported by any authority or the record. Notably, father's insistence that he was the primary authority into what was best for E. and his refusal to consider the recommendations of others led at least partly to the need for juvenile court jurisdiction. Furthermore, although he was not a decisionmaker, father was not prevented from providing information relevant to E.'s needs. Indeed, he attended at least one of the IEP meetings and communicated with mother about services for E.

In sum, father has not established that the court abused its discretion in awarding sole legal custody to mother at the time of termination.

### C. Mother's challenge

Mother contends that the court abused its discretion by denying her request for sole physical custody of E. She argues that the court was required to determine E.'s best interest based on the assumption that she was moving to Colorado. Instead, by maintaining the prior joint custody arrangement, the court failed to conduct the proper analysis and therefore abused its discretion. We agree.

Where parents have joint custody of a child, the court may grant a move-away request if it finds it is in the child's best interests. (Fam. Code, § 3087; *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 40, fn. 12. (*Burgess*).) The relocating parent does not have a presumptive right to change the child's residence, and the other parent does not have to show detriment. (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 363–364 (*Niko*).) Rather, the trial court determines de novo what physical custody arrangement is in the child's best interests. (*Id*. at p. 364.) As

our Supreme Court has explained, a trial court should ordinarily consider a non-exhaustive list of factors in assessing a move-away request, including the child's "interest in stability and continuity in the custodial arrangement," the distance of the move, the child's age, the child's relationship with both parent, the relationship between the parents, the wishes of the child where appropriate, the reasons for the proposed move, and "the extent to which the parents currently are sharing custody."  (*In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1101 (*LaMusga*).)

"The value in preserving an established custodial arrangement and maintaining stability in a child's life is obvious. But when the status quo is no longer viable and parents have joint custody, a court must review de novo the best interest of the child. It can fashion a new time-share arrangement for the parents." (*Niko, supra*, 144 Cal.App.4th at p. 364.)  "In other words, the de novo review that applies in a joint parenting situation is, 'in effect, a "reexamination" of the basic custody arrangement' because one parent's relocation in a joint physical custody arrangement will necessarily disrupt the status quo, and will require the court to modify the existing custody arrangement." (*Mark T. v. Jamie Z.* (2011) 194 Cal.App.4th 1115, 1126 (*Mark T.*).)

"We review orders granting or denying move-away requests for abuse of discretion."  (*Jacob A. v. C.H.* (2011) 196 Cal.App.4th 1591, 1598–1599; see *Burgess, supra*, 13 Cal.4th 25, 32; *Mark T, supra,* 194 Cal.App.4th at p. 1124.)  "A discretionary order that is based on the application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion, and is subject to reversal even though there may be substantial

evidence to support that order."  (*Mark T., supra*, 194 Cal.App.4th at pp. 1124–1125.)

Mother argues that the juvenile court failed to properly consider her relocation request because it failed to make findings as to what custodial arrangement would be in E.'s best interests if mother moved to Colorado.  In a move-away request, "[t]he court must decide de novo what physical custody arrangement would be in the child's best interests, *assuming that the requesting parent will relocate*."  (*Mark T., supra*, 194 Cal.App.4th at p. 1127.)  A court misapplies this rule where it denies a move-away request to preserve the status quo, or to coerce the moving parent to abandon their plans.  (*Mark T., supra*, 194 Cal.App.4th at p. 1128.)

Here, the juvenile court found that it was in E.'s best interest to maintain the joint custody arrangement under which E. lived with mother during the week and with father on weekends.  The court based this conclusion on a finding that E. was bonded to both parents and had spent substantial time living with each of them.  But the court was required to assume that mother was moving to Colorado and to determine what custody order would be in E.'s best interest under *those* circumstances.  The court did not expressly do so and did not address changes to the custody order that would have to be made if mother moved to another state.  Although mother suggested in her argument below that she would remain in Los Angeles if the court did not grant her sole physical custody, the court was not allowed to consider that statement.  (See *Mark T. supra*, 194 Cal.App.4th at p. 1128 [court erred in considering mother's statement that she would not move if her request was denied]; *Jacob A. v. C.H., supra*, 196 Cal.App.4th at p. 1601 ["Faced with an admittedly

33

difficult decision, the trial court skirted the question entirely and issued an order purporting to maintain the status quo"]; see also *LaMusga, supra*, 32 Cal.4th at p. 1098.)

Thus, the court abused its discretion in failing to assess E.'s best interest under the *LaMusga* factors and based on the premise that mother was relocating to Colorado. We therefore remand the matter to the family court for reconsideration of physical custody and mother's relocation request.

## DISPOSITION

The jurisdiction and disposition orders are affirmed. The December 23, 2022 order is reversed as to the issue of physical custody. The matter is remanded to family court for a determination of physical custody.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

CURREY, P.J.

ZUKIN, J.

34