Filed 9/12/24  J.D.B. v. Superior Court CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| J.D.B. et al.,<br><br>  Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN LUIS OBISPO COUNTY,<br><br>  Respondent;<br><br>COUNTY OF SAN LUIS OBISPO DEPARTMENT OF SOCIAL SERVICES,<br><br>  Real Party in Interest. | 2d Civil No. B338397<br>(Super. Ct. No. 23JD-00131-001)<br>(San Luis Obispo County) |

J.D.B. (Mother) and J.M. (Father), the biological parents of J.B., born in May, 2023, petition for extraordinary writ relief from the juvenile court's orders terminating family reunification services (Welf. & Inst. Code, § 366.21, subd. (e)(1),

(e)(2))[1], setting a hearing to consider the termination of their parental rights (§ 366.26) and denying Mother's petition to transfer the case to San Benito County. (§ 388.) They contend the order terminating services is not supported by substantial evidence. They further contend that the trial court erred in denying Mother's section 388 petition to transfer the case to San Benito County, where the parents currently reside.

In entering its order terminating reunification services, the juvenile court acknowledged that this was a close case because Mother and Father have made commendable, although somewhat belated, progress in addressing their long histories of substance abuse. They have also consistently and appropriately participated in visits with their son, despite difficulties presented by their residence in another county. The court concluded, however, that it could not "find enough facts and the law" to "accommodate" the necessary findings that Mother and Father had made substantive progress on their case plans and that there was a substantial probability the child could be returned to their custody within six months. The juvenile court based this conclusion on evidence that Mother and Father had not participated consistently in county-sponsored behavioral health group meetings as directed by their social worker. In addition, Mother and Father were living in separate sober living homes. Neither parent had shown an ability to maintain their recovery while living independently, increasing the risk of relapse and re-removal. Independent living was not an element of either parent's case plan.

---

[1] All statutory references are to the Welfare & Institutions Code unless otherwise stated.

After the juvenile court assumed jurisdiction over J.B. and before the status review hearing, the Legislature amended section 366.21, subdivision (e)(1). The former statute originally provided, "The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." Effective January 1, 2024, however, that sentence is removed from the statute. (Stats. 2023, ch. 714, § 1 (S.B. 463).) It now provides, "In making its determination [of whether return of the child to parental custody would create a substantial risk of detriment to the child], the court shall . . . consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which they availed themselves of services provided . . . ." (§ 366.21, subd. (e)(1).)

The record does not clearly establish whether the juvenile court was aware of this statutory change when it entered its order terminating family reunification services. In its opposition to the writ petition, counsel for real party in interest relied on the now-repealed version of the statute. For these reasons, and because evidence of the parents' progress in recovery and participation in treatment is closely balanced, we grant the petition. An extraordinary writ is issued directing the juvenile court to vacate its order of May 29, 2024 terminating family reunification services and setting the matter for a section 366.26 hearing. The matter is remanded to the juvenile court with directions to conduct a new section 366.21 hearing.

*Facts*

J.B. was born in May, 2023, showing signs of substance withdrawal that required treatment in a neonatal

3

intensive care unit. Hospital staff referred the matter to the San Luis Obispo County Department of Social Services (Department). Mother admitted having used fentanyl five days prior to the birth. Father said that he used methamphetamine and fentanyl daily for several years and had last used fentanyl about three or four days earlier. Hospital staff described both parents as "cooperative and appropriate" with the baby and with staff. Mother and Father also immediately expressed to the social worker a desire to enter residential treatment. They stated they understood J.B. would be taken into protective custody and identified Father's sister as a possible placement. Mother told the social worker that she wanted to enter treatment after she was discharged from the hospital and "expressed her commitment to 'do whatever I have to do' to reunify" with J.B.

Mother and Father frequently visited J.B. while he was in the Neonatal Intensive Care Unit (NICU). J.B. was discharged from the hospital and placed with the paternal aunt on May 19. Mother and Father did not contest his placement in foster care. They continued to attend visitation. During this same period, however, Mother and Father continued to use illegal substances while they awaited entry into residential treatment.

The parents accepted the first spaces in residential treatment that were offered to them, even though those spaces were outside San Luis Obispo County. Mother entered treatment on July 10, 2023. After successfully completing treatment, she moved into a sober living home in San Benito County. Father entered residential treatment on July 6, 2023. He graduated from the program in mid-December 2023, and then moved directly into a sober living home, also in San Benito County. Consistent with the advice they received from their social worker

4

and substance abuse counselors, Mother and Father decided to remain in San Benito County, away from the influences in San Luis Obispo County that had supported their chronic substance abuse.

Both parents have decades' long histories of substance abuse and unsuccessful attempts at recovery. Mother has two other biological children. Her eldest child is the subject of a guardianship. Mother's parental rights to the younger child were terminated in 2014. Father has one other biological child; his parental rights to that child were terminated in 2014.

After graduating from residential treatment, each parent moved into a different sober living house in San Benito County. To remain in their respective houses, each parent agreed to attend one house meeting and three 12-step group meetings each week. The houses also require residents to submit to drug testing on request of staff. Both Mother and Father have consistently complied with these house rules. Staff at their sober living homes have expressed no concerns regarding their behavior or sobriety.

Mother and Father each take methadone with a prescription. Their provider requires monthly testing to obtain take-home doses of methadone. Mother's test results were favorable after she completed residential treatment, although she missed tests in September and November 2023. Father has tested monthly and all of his results have been favorable.

By December 2023, Mother and Father were able to transfer their Medi-Cal coverage to San Benito County and were eligible for drug and alcohol services through that county. Mother attended group counseling through the county's behavioral health department, sometimes in person and

sometimes via Zoom.  Her counselor reported, however, that she did not participate consistently and had six unexcused absences.  Mother continued to have favorable drug test results.  Her counselor and social worker reported that Mother had some inappropriate angry outbursts.  She also sent the social worker multiple long, confrontational text messages.

Father continued to have favorable test results but was also inconsistent in his attendance at group meetings.  After complaining about lack of transportation, the county allowed him to attend via Zoom.  Throughout this period, the parents consistently attended visitation with their son and requested additional and longer visits.

In late January 2024, the parents attended a Child and Family Team (CFT) meeting in San Luis Obispo County with their social worker and her supervisor.  At this meeting, "the team discussed the expectations for progressive visitations, consistent case plan participation, and behavioral change towards communication and blaming."  The social worker asked the parents to provide weekly progress reports and "made it clear that in order for the case to be transferred to [another] county or for reunification to progress, they needed to actively participate in treatment and only miss groups due to illness."

After the CFT meeting, Mother continued to have favorable test results, but her counselor reported to the social worker that she was not participating in the Zoom group meetings and continued to have inappropriate outbursts.  Father also had favorable test results but inconsistent participation in group sessions.  He was employed full time at a non-profit organization doing outreach and health education in homeless encampments.

In March 2024, the Department recommended that the juvenile court terminate reunification services for both parents, maintain the child's foster care placement and schedule the matter for a permanency planning hearing. This recommendation was based on the parents' "lack of engagement in their ongoing Drug and Alcohol Services (DAS) program in San Benito County. It is the Department's opinion that the parents are focused on finding employment rather than engaging in their court-ordered services and fostering their recovery to create safety and stability for [the child]." The Department noted that the six-month review hearing had been continued several times but there had been "no change to the parent[s'] level of engagement in treatment despite the social worker clearly communicating expectations, attempting to collaborate with their clinicians and management at their sober living homes, and increasing visitation." While the social worker acknowledged that their visits with the child "go very well," she concluded the parents "have not demonstrated consistency in their testing and attendance at the DAS services or the behavior change that would align with a sustainable recovery."

One month later, in April 2024, the Department's recommendation remained unchanged although the social worker acknowledged that Mother had been attending group meetings twice each week and testing three times a week. Mother had a new counselor in San Benito County and he reported that she was consistently engaged in the group sessions and testing favorably. Father's counselor made a similar report, noting that Father had been attending group meetings via Zoom and testing regularly.

The Department acknowledged that the parents had "recently demonstrated consistency in their engagement with their Drug and Alcohol Services . . . in San Benito County, that visits continue to [be] appropriate, and that they provide a safe environment for [the child]." The Department remained "concerned that parents have not been able to demonstrate the behavioral change necessary for sustainable recovery over a period of time. Although the parents are presently sober, they have struggled throughout this case to take full accountability for their behavior, to be appropriately and fully communicative with their social worker, and to verbalize their coping and relapse prevention strategies." While the Department recognized that "the parents do have many strengths," it concluded that it "has not seen the significant progress indicative of a successful reunification over the last 11 months that this family has been working with the Department and, as a result, has recommended termination of services."

The April 2024 report attached client reports from the parents' counselors at San Benito County Behavioral Health (SBCBH). Both parents had recently been assigned to new counselors. The new counselor reported that, in March, Mother had attended 18 out of 20 scheduled individual and group counseling sessions, with two excused absences. She had favorable drug test results after testing 3 times per week. Her counselor reported that Mother, "remains consistent in her treatment," participating well in groups and had a "positive attitude." Similarly, Father had attended 16 of 20 scheduled individual and group sessions, with 4 excused absences. His drug tests were all favorable. The counselor, who acknowledged that he had had limited contact with Father, reported that Father was

maintaining full time employment while "attending groups with a positive attitude. . . ."

*The Six-Month Status Review Hearing*

At the six-month review hearing, Father's employer testified that he was working full time and meeting all expectations. She had no concern about Father being under the influence at work. Both parents were residing in sober living homes operated by Sun Street Centers. The chief program officer of that organization testified that Mother and Father were both attending at least 3 group meetings each week and were subject to drug testing on request of staff. They were complying with their sober living house's rules and had no reports of discipline.

Mother testified that she had attended some SBCBH group meetings in person but missed "a couple [of] groups" when her car broke down. She also missed group meetings to attend her son's physical therapy sessions by Zoom, because they were scheduled at the same time. Mother testified that she missed other meetings after Father's mother died, although she also admitted that the meetings she missed were not on the same day as the funeral. She testified that she had some conflict with her first SBCBH counselor but was doing better with her new counselor. Mother acknowledged that she was not in total compliance with her case plan until she was assigned to the new counselor in February 2024.

Mother admitted that it was difficult for her to travel to San Luis Obispo County to attend J.B.'s medical appointments, so she had only attended his MRI. The distance between her residence and J.B.'s prevented her from attending other appointments and from visiting with him multiple times a week. Mother understood that, if the case was transferred to San Benito

9

County, J.B. would need to move to different foster placement, with a non-family member caretaker. This would be disruptive for him because he had been placed with his paternal aunt since leaving the hospital shortly after his birth.

Father testified that he went to residential treatment in Salinas and moved to a sober living home in San Benito County to get a fresh start. At the sober living home, he attends regular Narcotics Anonymous meetings and SBCBH groups, although he missed some meetings due to COVID and around the time of his mother's death. He switched to a different SBCBH counselor because his first counselor refused to give him drug tests. With the new counselor, Father was testing more frequently.

Father acknowledged that he and Mother had never lived together as a sober couple. Prior to August 2023, he had not remained sober for more than a couple of days over a 10-year period. Father believed that methadone was vital to his continued recovery. He and Mother traveled to San Luis Obispo County every month to receive take-home doses. He and Mother have been able to find transportation to pick up their methadone in San Luis Obispo County. Father did not discuss with the social worker any difficulty he had in transferring his Medi-Cal benefits to San Benito County or in paying for his space in the sober living house. He had attended one of J.B.'s medical appointments and could not recall asking the social worker for information about upcoming appointments.

The social worker assigned to J.B.'s case described Mother's engagement with services as "[v]ery minimal" in December 2023 and January 2024. Mother did not share with the social worker that she was having conflict with her first

SBCBH counselor.  At the January 2024 CFT meeting, the social worker explained to Mother and Father that they needed to completely comply with their case plans to continue receiving services.  Even after the meeting, Mother had difficulty engaging with the services.  The social worker had difficulty communicating with her counterparts in San Benito County to obtain test results for the parents.

The parents increased their level of compliance with their case plans after the Department changed its recommendation to terminate their services.  Despite their recent compliance, the social worker continued to recommend termination of services because the parents had not shown significant progress or a substantial probability that they would reunify with J.B. before the 12-month hearing.  She opined that there was a higher risk that J.B. would have to be removed from parental custody again because the parents had no history of maintaining sobriety over a significant period of time.

The social worker acknowledged that she did not tell the parents at the CFT that she wanted them to move out of their sober living homes and live independently.  Instead, the Department encouraged the parents to stay at their sober living homes.  She opined that the biggest barriers to reunification were "the concern of [the parents] being new into their sobriety and their ability to communicate and problem solve with the Department on . . . where they're at in their sobriety."  She remained concerned about both parents' commitment to sobriety given their histories and continued use of fentanyl in the interim between J.B.'s birth and their placements in residential treatment.  Considering the totality of the circumstances, the social worker opined that the parents had not made enough

progress to warrant continued services because they "have a long history of substance abuse . . . and there's a higher chance of re-removal and that's detrimental to J.B.'s well-being."

*The Juvenile Court's Order*

At the conclusion of the hearing, the juvenile court accepted the Department's recommendation, ordering that reunification services be terminated and setting the matter for a permanency planning hearing. It also denied Mother's section 388 petition to transfer the case to San Benito County. It first found that returning J.B. to parental custody would create a substantial risk of detriment to him. "And a lot of that has to do with not so much that the parents haven't taken some steps to comply with their case plan. And I celebrate their sobriety and those steps that go along with it. But if the request and what the Court has to do is determine if that's going to happen today, the Court can't say that that can happen today." It next found the Department had offered reasonable services to the parents.

The juvenile court next considered whether it could find, by clear and convincing evidence, that the parents failed to participate regularly and make substantive progress in the case plan. It acknowledged that the evidence on this point was mixed. The parents had taken steps to become sober and maintain their sobriety. The parents did not engage in treatment until the "critical point" when the Department changed its recommendation, almost one year into the case. "And neither parent is in the community, in . . . sobriety on their own as an independent party." So, although it found the parents had made some progress, considering the "entirety of the requirements," the juvenile court found the parents had not made substantive

progress on their case plans.  It acknowledged, however, "It's a close call on that one."

The court also found there was not a substantial probability that J.B. could be returned to parental custody within six months, "because the parents have long histories of drug usage and also the inability to stay sober for some long period of time."  The parents had not established independent residences and had not been able, because of the distance, to visit with J.B. often enough.  In light of J.B.'s special needs and the parents' lack of experience in caring for them, the juvenile court found there was not a substantial probability of his return to parental custody.

The juvenile court acknowledged that it was "really rooting" for the parents to see if it could "find enough facts and the law to be able to accommodate" findings of substantive progress and a substantial probability of return.  In the end, however, the court stated it was unable to make those findings. It denied the section 388 petition to transfer the case for the same reasons.

*Standard of Review*

We apply the familiar substantial evidence standard when reviewing an order terminating reunification services under section 366.21.  (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535.)  This requires us to review the entire record in the light most favorable to the juvenile court's findings to determine whether it contains substantial evidence to support those findings.  (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1121-1122.)  We do not make credibility determinations or reweigh the evidence.  Instead, we resolve all conflicts in favor of the juvenile court's order and indulge all

13

legitimate inferences to uphold it.  (*J.H., supra,* at p. 535.) In applying this standard, we take into account the standard of proof to be applied by the juvenile court.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

We review de novo the juvenile court's legal conclusions.  An order that is "'based on the application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion, and is subject to reversal even though there may be substantial evidence to support that order. . . .'" (*E.C. v. J.V.* (2012) 202 Cal.App.4th 1076, 1084, quoting *Mark T. v. Jamie Z.* (2011) 194 Cal.App.4th 1115, 1124-1125; see also *In re Henry V.* (2004) 119 Cal.App.4th 522, 529-530.)

*Discussion*

*Termination of Reunification Services*

Section 366.21, subdivision (e)(1) provides that, at a status review hearing held between six and 12 months after a child enters foster care, "the court shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."  Previous iterations of the statute provided that the parent's failure "to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (Former § 366.21, subd. (e)(1).)  This sentence was deleted from the statute in an amendment that became effective January 1, 2024, after J.B. entered foster care but before the juvenile court entered its order on May 29, 2024.  (Stats. 2023, ch. 714, § 1.)

14

In deciding whether the return to parental custody would be detrimental, the juvenile court is required to "review and consider the social worker's report and recommendations . . . and shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which they availed themselves of services provided . . . ." (§ 366.21, subd. (e)(1).)  Where, as here, the child is under 3 years of age on the date of initial removal, "and the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing pursuant to Section 366.26 within 120 days. If, however, the court finds there is a substantial probability that the child . . . may be returned to their parent or legal guardian within six months or that reasonable services have not been provided, the court shall continue the case to the 12-month permanency hearing." (*Id*., subd. (e)(3).)

The recent amendment to subdivision (e) of section 366.21 expands the juvenile court's discretion to continue reunification services even where parents have not been uniformly compliant with their treatment plans.  Here, however, the record does not clearly indicate that the juvenile court had this expanded discretion in mind when it ordered the termination of reunification services.[2]  Instead, it acknowledged that evidence of the parents' participation in and substantive progress on their case plans was "mixed,"  and that it "struggled" to make the

_____

[2] The written reports presented by the Department to the juvenile court do not mention the new standard, nor is it expressly referred to in the court's written orders.  Counsel for the Department quoted and relied on the former version of the statute in opposing the writ petition.

15

"close call" that the parents had not made substantive progress on their case plans.  In reaching this conclusion, the juvenile court stated that it relied heavily on evidence that the parents had inconsistent attendance at county-sponsored group meetings, were not living independently of their sober living houses and had long histories of substance abuse and relapse.

To terminate reunification services and schedule the section 366.26 hearing, the juvenile court was required to find "by clear and convincing evidence that the parent[s] failed to participate regularly and make substantive progress in a court-ordered treatment plan . . . ." (§ 366.21, subd. (e)(3).)  This requires "'"a finding of high probability.  The evidence must be so clear as to leave no substantial doubt.  It must be sufficiently strong to command the unhesitating assent of every reasonable mind. . . ."'"  (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1205-1206; see also *In re B.D.* (2008) 159 Cal.App.4th 1218, 1232.)

Without relying on the now-repealed prima facie evidence of detriment standard, it is difficult to see how this record amounts to clear and convincing evidence that reunification services should be terminated.  Mother and Father both graduated from residential treatment and moved directly into sober living homes.  To remain in those homes, they were required to attend 12-step meetings and to submit to drug testing at the request of staff.  Neither parent was disciplined for violating these house rules.  Instead, it appears they complied with these requirements even if their attendance at other, county-sponsored groups was inconsistent.  After graduating from residential treatment, the parents have also consistently tested negative for illicit substances.  At the same time, they have attended their visits with J.B. and behaved appropriately

16

with him, even though those visits have been limited by their geographic circumstances.

Prior to the continued six-month review hearing, the Department acknowledged that the parents "have recently demonstrated consistency in their engagement with their Drug and Alcohol Services . . . in San Benito County, that visits continue to remain appropriate, and that they provide a safe environment for [J.B.]." Similarly, the juvenile court recognized that the evidence was mixed and that the question whether the parents had made substantive progress was a close one. In light of these conclusions, the recent statutory change and the inconclusive evidentiary record, we conclude the order terminating reunification services and setting the section 366.26 hearing was not supported by sufficient evidence. The writ petition is granted with respect to that order.

*Denial of Section 388 Petition*

Mother filed a section 388 petition to transfer jurisdiction over the matter to San Benito County. The Department opposed the petition because it had recommended termination of reunification services and because transferring jurisdiction over the case would require J.B.'s placement in a different, non-familial foster home. The court denied the petition for the same reasons.

We review the order denying Mother's section 388 petition for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) Under this deferential standard of review, we will not disturb the order unless the record clearly establishes that the order was arbitrary, capricious or patently absurd. (*Ibid*.)

17

The trial court did not abuse its discretion when it denied the section 388 petition. Transferring the case to San Benito County would have disrupted J.B.'s stable placement with his paternal aunt. An order that promotes stable placements is not arbitrary or capricious.

*Disposition*

The order denying the section 388 petition is affirmed.

The petition for extraordinary relief is granted and the order dated May 29, 2024 terminating reunification services and setting the section 366.26 hearing is vacated. The matter is remanded with directions to the juvenile court to conduct a new section 366.21 hearing.

<u>NOT TO BE PUBLISHED.</u>


YEGAN, Acting P. J.

We concur:


BALTODANO, J.


CODY, J.

18

Gayle L. Peron, Judge

Superior Court County of San Luis Obispo

_____

J.D.B. and J.M., in pro per, for Petitioners.

No appearance for Respondent.

Rita L. Neal, County Counsel, Ann Duggan, Vincent Uberti, Deputy County Counsels, for Real Party in Interest.